**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert C. THETFORD,**
**Defendant-Appellant.**

**No. 80–2211.**

United States Court of Appeals,
Fifth Circuit.

May 20, 1982.

Rehearing and Rehearing En Banc
Denied July 8, 1982.

John D. Copeland, Charles L. Caperton, Dallas, Tex., for defendant-appellant.

Glenn L. Archer, Asst. Atty. Gen., Michael L. Paup, Chief Appellate Section, James A. Bruton, Arthur L. Passar, James Springer, Tax Div., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before COLEMAN, REAVLEY and SAM D. JOHNSON, Circuit Judges.

SAM D. JOHNSON, Circuit Judge:

This is an appeal of a conviction for tax evasion and for obstructing justice by threatening persons cooperating with Internal Revenue Service (IRS) investigators. The conviction arises out of Robert Thetford's ownership and operation of adult movie theaters in Texas, Florida, and Ohio from 1972 to 1974. He has been sentenced to confinement for forty-four years. Thetford here asserts a variety of errors: insufficiency of evidence, double jeopardy, improper jury instructions, variance between the indictment and jury charge, refusal to reopen testimony at trial, admission of prejudicial evidence, and failure to include the Government's Bill of Particulars in the jury charge.

## I. Background

Through his solely owned corporation, Artex Theaters, Inc. (Artex), Robert Thetford operated "X-rated" movie theaters on a cash basis in Texas, Ohio, and Florida from 1972 until 1974. During these years, Thetford not only failed to file the corporate income tax returns for these theaters, but also failed to file his joint personal tax return for 1973 and his and his wife's separate tax returns for 1974. These were not prepared and filed until 1976.

In the latter part of 1974, Thetford's lawyer and accountants began preparing his tax returns, based upon boxes of daily receipts and expense records which Thetford provided from the theaters. Thetford's corporate tax returns reflected gross receipts from the theater operations which totaled approximately $626,000 in 1972, $468,000 in 1973, and $477,000 in 1974, with the taxable income for these same years reported as approximately $48,000, $31,000, and $66,000. On their joint income tax return for 1973, Thetford and his wife reported gross income as $29,500 and taxable income as $24,950. On each of their separate income tax returns for 1974, Thetford reported gross income of $15,000 and taxable income of $12,500.

The IRS began an investigation of Artex in October 1975, just before Thetford filed these tax returns. As that investigation progressed, the IRS became aware of several irregularities in Thetford's tax returns. For example, many daily theater receipt reports were missing, coinciding for the most part with the periods that the lucrative movie *Deep Throat* was playing at several of Thetford's theaters. Using the sequential ticket numbers reflected on the daily reports before and after the days for which no reports were provided, IRS agents determined that at least $65,000 in corporate receipts from Texas theaters were not reported in 1973 and at least $45,000 in corporate receipts were not reported in 1974.

The investigation also revealed that Thetford had failed to report about $73,000 in

receipts from the Livingston Arts Theater (Livingston Theater) which he had opened in Columbus, Ohio, through a "dummy" corporation named "Thrush." This was established by the records and testimony of Artex employee Wayne Sharp who managed that theater in 1972 and testified that he had transmitted approximately $20,000 in profits from Livingston Theater to Thetford. In addition, the IRS uncovered evidence that Thetford received at least $8600 in 1973 and approximately $40,000 in 1974 from the Palms Theater in St. Petersburg, Florida. None of the income from the Palms Theater was reported on Artex's corporate tax return or on Thetford's individual tax return. In fact, Robert Moore, the nominal president of Artex, testified that Thetford instructed him not to turn over Thetford's records on his out-of-town theaters to his accountants. Thetford indicated he would take care of the records for those theaters himself.

On the basis of this investigation, a thirteen-count indictment was returned against Thetford, who was then arrested and held on a $1,000,000 bond. The first six counts of the indictment focus on Thetford's individual income tax returns. Counts One and Two allege the willful and knowing subscription to individual income tax returns which underreported gross income for calendar years 1973 and 1974, in violation of 26 U.S.C. § 7206(1). Count Three alleges the willful and knowing underreporting of the gross income of Thetford's wife, Sharon, for calendar year 1974, in violation of 26 U.S.C. § 7206(2). Counts Four and Five allege the willful and knowing evasion of personal income taxes for 1973 and 1974 in violation of 26 U.S.C. § 7201. Count Six alleges the willful and knowing evasion of taxes filed in the name of Thetford's wife, Sharon, for calendar year 1974, in violation of 26 U.S.C. § 7201. Counts Seven through Nine focus on the corporate tax returns, and allege the willful and knowing subscription to the false corporate tax return of Artex for the calendar years 1972, 1973, and 1974.[1]

The last four counts, Counts Ten through Thirteen, focus on Thetford's efforts to obstruct an IRS investigation of the described violations. Count Ten alleges the willful and knowing conspiracy of Thetford and Charles L. Musick to delay and prevent communication of information to the IRS by Robert Moore and Larry Jones, two former Artex employees, in violation of 26

---

1. In its Bill of Particulars, the Government states Thetford's true tax liability on individual income tax returns and on corporate tax returns as follows:

| | Gross Income | Taxable Income | Income Tax |
|---|---|---|---|
| The 1973 joint individual income tax return of Robert C. and Sharon W. Thetford should have reported at least | $95,684.96 | $91,135.00 | $39,861.00 |
| The 1974 individual income tax return of Robert C. Thetford should have reported at least | $57,619.00 | $42,492.00 | $18,115.00 |
| The 1974 individual income tax return of Sharon Thetford should have reported at least | $57,619.00 | $42,492.00 | $18,115.00 |

| | Corporate Gross Receipts or Revenues from Theatres | Taxable Income | Income Tax |
|---|---|---|---|
| The 1972 corporate return of Artex Theatres, Inc. should have reported at least | $700,548.00 | $62,487.00 | $21,619.00 |
| The 1973 corporate return of Artex Theatres, Inc. should have reported at least | $540,129.93 | $100,187.96 | $41,180.00 |
| The 1974 corporate return of Artex Theatres, Inc. should have reported at least | $562,818.31 | $125,775.00 | $60,372.00 |

U.S.C. §§ 7201 and 7206. Several overt acts are listed as evidence of the conspiracy, including a request by Thetford to Musick that Robert Moore, former nominal president of Artex, be "hit" because he was talking too much to Special Agents of the IRS. There was also evidence that Robert Thetford gave Musick $2,000 in cash to pay Larry Gerard to kill Larry Jones, a theater operator employed by Thetford. This was an apparent response to Thetford's conclusion that Larry Jones could not "stand the heat" of the Artex investigation. Jones was later murdered. Counts Eleven, Twelve, and Thirteen allege attempts by means of intimidation and threats of force to obstruct, delay, and prevent communication of information by Jim Sharp, Wayne Sharp, Robert Moore, and Larry Jones to IRS investigators, in violation of 26 U.S.C. §§ 7201 and 7206. Thetford had become aware of the IRS investigation at an early date and according to testimony from several of his employees, sought to obstruct the IRS investigation by means of intimidation and threats of force.

The district court vacated the convictions on Counts One, Two, and Three.[2] The Government concedes error as to Count Thirteen.

## II. Individual Tax Return Violations

Thetford was convicted on Counts Four, Five, and Six, which allege knowing and willful tax evasion, in violation of 26 U.S.C. § 7201.[3] Under this statute, the jury convicted Thetford of willful tax evasion by filing a fraudulent joint income tax return for calendar year 1973 (Count Four), by filing a fraudulent separate income tax return for calendar year 1974 (Count Five), and by filing a fraudulent separate income tax return in the name of his wife, Sharon, for the calendar year 1974 (Count Six).

### A. Sufficiency of Evidence

■ To sustain a conviction under 26 U.S.C. § 7201, it is incumbent upon the Government to demonstrate a tax deficiency, an affirmative act of evasion, and willfulness. United States v. Coppola, 425 F.2d 660, 661 (2d Cir. 1969); Elwert v. United States, 231 F.2d 928, 932–933 (9th Cir. 1956). In considering the sufficiency of evidence, this Court must read the evidence in the light most favorable to the Government, and must reverse the convictions only if it finds that any reasonable jury must necessarily have entertained a reasonable doubt as to the defendant's guilt. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); United States v. Ocanas, 628 F.2d 353, 360 (5th Cir. 1980), cert. denied, 451 U.S. 984, 101 S.Ct. 2316, 68 L.Ed.2d 840 (1981).

Viewed most favorably to the Government, the evidence clearly reflects a tax deficiency for 1973 and 1974. For 1973, Thetford's employees testified Thetford received from the Palms Theater at least $8600 and probably as much as $17,000.[4] In

2. The jury convicted Thetford on Counts Four, Five, and Six, all based on the tax evasion provisions of 26 U.S.C. § 7201. Counts One, Two, and Three (the under-reporting counts) were lesser included offenses, for which consecutive sentences could not be imposed. Citing the holding of the Fifth Circuit in United States v. Beasley, 519 F.2d 233 (5th Cir. 1975), reversed on other grounds, per curiam, 535 F.2d 293 (5th Cir. 1976), the district court vacated the convictions and the sentences on the first three counts. In Beasley this Court held that

> The making and subscribing of a tax return without believing it to be true and correct, made criminal by 26 U.S.C. § 7206(1) is also an offense included within the crime of willful attempt to evade taxes as defined by 26 U.S.C. § 7201.

519 F.2d at 245.

3. 26 U.S.C. § 7201 provides:

> Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony, and upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than five years, or both together with the costs of prosecution.

4. Contrary to Thetford's testimony that it had cost him $20,000 to $25,000 to open the Palms Theater, Wayne Sharp testified that Thetford paid only about $5000 to open the theater. Other equipment costs were deducted from the income from the theater before Thetford's profits were sent to him.

addition, unreported income from Thetford's Texas theaters, after accounting for average daily expenses, totalled at least $61,000. Thus, the Government established that Thetford had not reported at least $69,000 on his 1973 income tax return. The Government also established that Thetford received at least $40,000 in profits from the Palms Theater in 1974, and at least another $24,000 in unreported income from his Texas theaters during that same year.

The evidence shows that Thetford willfully withheld payment of taxes. The evidence demonstrates that Thetford received a substantial sum of cash from the operation of Artex which was delivered to him by his employees, yet this was never reflected in the records of the corporation, was not reported on Artex's corporate tax returns, and was not disclosed to the accountants who prepared Thetford's tax returns. It is well settled that a shareholder's withholding, diversion, or "skimming" part of a corporation's cash receipts, so that they are not reflected on the corporation's records, renders the shareholder criminally liable not only for understatement of the corporation's income, but also for understating his individual income. *United States v. Miller*, 545 F.2d 1204 (9th Cir. 1976), *cert. denied*, 430 U.S. 930, 97 S.Ct. 1549, 51 L.Ed.2d 774 (1977); *Bernstein v. United States*, 234 F.2d 475 (5th Cir.), *cert. denied*, 352 U.S. 915, 77 S.Ct. 213, 1 L.Ed.2d 122 (1956); *Davis v. United States*, 226 F.2d 331 (6th Cir. 1955), *cert. denied*, 350 U.S. 965, 76 S.Ct. 432, 100 L.Ed. 838 (1956).

Thetford contends that he never converted the money to his personal use, but merely held and disbursed the funds for the corporation. He asserts that the Government produced no evidence that he used these funds for any purpose other than the corporation's business. The burden, however, does not lie upon the Government in this instance to show how the funds were spent. Once a taxpayer has taken control of funds diverted from a corporation and then fails to report such funds as income or to make any adjustment in the corporate books to reflect a return of capital, that is sufficient to imply willful intent to evade taxes. *See United States v. Miller*, 545 F.2d at 1214 n.12. Obviously, the question of whether diverted funds constitute a constructive distribution of profits depends on the factual circumstances involved in each case under consideration. *Miller*, 545 F.2d at 1214. In the instant case, however, there is ample evidence for a reasonable jury to conclude that a constructive distribution of profits had occurred.[5] Accordingly, the evidence is sufficient to affirm convictions on Counts Four, Five, and Six.

## B. *Double Jeopardy Allegation on Counts Five & Six*

Thetford contends that the imposition of consecutive sentences on Counts Five and Six constitutes an impermissible dual punishment for the same act or offense. Count Five charges Thetford with tax evasion on his 1974 separate tax return; Count Six charges him with tax evasion on his wife's 1974 separate tax return. Thetford and his wife were separated when their 1974 returns were prepared and there was concern that she might not be located to sign a joint return. Separate returns were therefore prepared for Thetford and his wife in which the community income was divided, with one-half of such income allocated to Thet-

---

5. Thetford asserts that there is no evidence to show that there were Artex earnings and profits from which dividends could be paid, so no constructive dividend existed. Thetford contends that accrued corporate tax liabilities, plus interest and penalties, wiped out the corporation's earnings and profits for 1973 and 1974. The only liabilities in evidence, however, were the IRS asserted tax deficiencies for 1970 and 1971. During 1973 and 1974, no corporate books or records were maintained which carried those asserted deficiencies as accrued liabilities. Thetford's tax attorney testified that this asserted deficiency was settled in August 1975. Thetford admitted that the dispute over 1970 and 1971 tax liabilities was settled for $4000. Finally, Thetford's arguments that earnings from profits should be reduced by penalties and interest owed on tax deficiencies is contrary to this Court's decision in *Bernstein*, 234 F.2d at 481–82. Therefore, a reasonable jury would not be required to accept Thetford's claim that the funds he diverted from the Artex corporations were not income to him.

ford's individual tax return and one-half allocated to his wife's individual tax return.

The question here involves the status of Thetford's signature on the two separate tax returns: whether each constitutes a separate offense or whether both represent a single act of tax evasion. The double jeopardy clause of the fifth amendment protects an accused from being twice subject to jeopardy for the "same offense." In *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), the Supreme Court set forth the general principle that it is a matter of statutory construction whether sanctions may be imposed for multiple offenses arising out of a single act or transaction. One function of double jeopardy protection is to ensure that multiple punishments are not imposed contrary to legislative intent. *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 1142, 67 L.Ed.2d 275 (1981).[6] The language of the Act, 26 U.S.C. § 7201—"willfully attempts in any manner to evade or defeat any tax imposed"—does not specifically limit liability to one offense. Construing this language, the Ninth Circuit in *Redfield v. United States*, 315 F.2d 76 (9th Cir. 1963), determined that when community-property income was reported in separate tax returns, separate transactions occurred each of which is subject to the penalty prescribed for the violation of 26 U.S.C. § 7201.

The facts in *Redfield* are almost identical with the case *sub judice*. In *Redfield*, a husband was responsible for the preparation of the separate returns for himself and his wife. Both returns were based upon computations in which all income was considered to be community income under the community property law of Nevada. The husband failed to report certain dividends, interest, and gains on the sale of securities on both his and his wife's separate returns. The Ninth Circuit affirmed the conviction of the husband for two separate offenses of tax evasion.[7] That court reasoned that by filing separate returns, the husband gained a benefit: namely, avoiding liability on his wife's share of the community income. Furthermore, the Government had to prove an additional fact in the case of separate returns that it would not have had to establish if the husband had filed jointly: that Redfield had consciously contributed to the attempted evasion of his wife's taxes. 315 F.2d at 81–82.

■ Beyond *Redfield*, there is an additional reason for sustaining on two separate counts. Thetford's signature on his wife's separate income tax return is more than a mere formality; it provides a separate, independent certification to the IRS of the accuracy of the wife's tax return.[8] Conviction on Counts Four and Five did not result in double jeopardy under the fifth amendment.

## III. *Corporate Tax Violations*

Under Counts Seven, Eight and Nine, Thetford was convicted for willfully filing false corporate income tax returns for calendar years 1972, 1973, and 1974, in violation of 26 U.S.C. § 7206(2).[9] Thetford con-

6. *See also United States v. Greschner*, 647 F.2d 740, 744 (7th Cir. 1981) (looking to legislative intent before applying the *Blockburger* test); *United States v. Fountain*, 642 F.2d 1083, 1093–95 (7th Cir.), *cert. denied*, 451 U.S. 993, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981) (same); *Pandelli v. United States*, 635 F.2d 533, 536 (6th Cir. 1980) (*Blockburger* test need not be applied when congressional intent clear).

7. Although Redfield was sentenced to serve concurrent terms of imprisonment for each count, he was also sentenced to pay the maximum fine for each count, the fines being cumulative. 315 F.2d at 78.

8. The income tax form contains the following affirmation:

Under penalties of perjury, I declare that I have examined this return, including schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete.

9. 26 U.S.C. § 7206(2) reads:

[Any person who] . . . willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document which is fraudulent or is false to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or

tends that the proof had no proper evidentiary basis on Count Seven, and that the district court failed to give an appropriate jury instruction on Counts Eight and Nine.

### A. *Sufficiency of Evidence on Count Seven*

In Count Seven, Thetford was charged with willful participation in preparing and presenting a fraudulent corporate income tax return for Artex for calendar year 1972. The essence of the charge is that certain Artex receipts had been omitted from its corporate tax return. In response, Thetford argues that the gross receipts of the Livingston Theater were properly reportable by the Ohio corporation, Thrush, a subsidiary of Artex. Thetford claims that, even if the corporate existence of Thrush is ignored, the evidence is still insufficient for conviction because, on advice of his accountants, he did report an estimate of the net profit of Thrush on the corporate tax return of Artex. Thetford asserts it was an honest error and not due to any willful conduct on his part.

Viewed in the light most favorable to the Government, however, any reasonable jury could have found the evidence sufficient to support conviction on this count. The Government presented evidence that Thrush was merely a "dummy" corporation or "false front" set up for the sole purpose of insulating Thetford from criminal obscenity charges. Both Wayne Sharp, who managed the Livingston Theater in 1972, and Jim Sharp, the general manager of Artex, Inc., so testified. This was corroborated by Charles Musick, who testified that Thetford had not only told him that Thrush was a dummy corporation, but also joked that the name "Thrush" had significance because it was a brand name for a set of mufflers, and the purpose of this corporation was likewise a "hush-up" or "quietener."

Furthermore, there was testimony that Thrush never held a stockholders meeting, never held a directors meeting, and never issued any stock. The Government also established that Thrush filed no tax returns. Moreover, legal expenses of about $16,000 incurred by the Livingston Theater in 1972 were billed directly to Artex and deducted by that corporation on its tax return for that year. On this evidence, the jury was entitled to ignore the corporate existence of Thrush, and to conclude that the gross receipts from the Livingston Theater should have been reported in the corporate return for Artex for the 1972 calendar year.

The jury was also entitled to reject Thetford's claim that he innocently omitted inclusion of gross receipts from the Livingston Theater on the advice of counsel or accountants. The Government presented evidence that Thetford had, in fact, concealed from his attorney and his accountant the extent of the gross receipts from the Livingston Theater. Robert Moore, nominal president of Artex, testified that Thetford's tax attorney had requested him to ask Thetford about the Livingston Theater receipts when the tax returns were being prepared. Moore conveyed the attorney's request to Thetford, who replied that he was not sure he wanted his accountant to know about the out-of-town theaters and that Thetford would take care of the records of those theaters himself.

Thetford's failure to fully disclose the out-of-town income is enough to rebut any claim that he showed good faith in filing the 1972 Artex tax return reporting only an estimated $10,000 net profit from the Livingston Theater.[10] Guilty knowledge and willfulness may reasonably be in-

---

document ... shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000 or imprisoned not more than three years, or both, together with the costs of prosecution.

**10.** Thetford testified that he made an approximate $10,000 profit from the Livingston Thea-

ter even though he kept no receipts for the money sent by Wayne Sharp, theater manager of the Livingston Theater. As Thetford related: "I had no receipts and I didn't have any records or receipts of any kind because Mr. Sharp had neglected to give them to myself or Mr. Moore .... It was just an estimate."

ferred when a defendant withholds information from his attorneys and accountants, even though he attempts to shift responsibility for a false tax return to them. *United States v. Garavaglia*, 566 F.2d 1056, 1059 (6th Cir. 1977); *United States v. Lisowski*, 504 F.2d 1268, 1272 (7th Cir. 1974); *United States v. Scher*, 476 F.2d 319, 321 (7th Cir. 1973). The jury was entitled to find that Thetford knowingly and willfully omitted substantial gross receipts from the Livingston Theater from the 1972 corporate tax return of Artex.

B. *Denial of Proposed Jury Instruction on Counts Eight and Nine*

Thetford contends that the district court erred in failing to give his requested jury instruction regarding the proper method of reporting partnership income.[11] Counts Eight and Nine of the indictment allege that Thetford knowingly and willingly participated in understating gross income on Artex's corporate tax returns for calendar years 1973 and 1974. One basis for this allegation was the Government's evidence that no income from the Palms Theater was reported on Artex's corporate income tax returns for either of those years.

Thetford responds that the evidence shows that the Palms Theater was a partnership consisting of two partners, Wayne Sharp and Artex, and that under these circumstances, Artex would not be required to report receipts from the Palms Theater as part of its gross receipts. Thetford contends that if the income from the alleged partnership is reportable at all, it is reportable as "other income" of Artex. It is Thetford's position that if the jury concluded that income from the Palms Theater was partnership income, it could not properly base a conviction for understating Artex's corporate receipts on that evidence. To avoid this possibility, Thetford submitted a proposed jury instruction which the district court rejected.

While a party may be entitled to an instruction on his theory of the case it need not be the specific instruction tendered. *United States v. Hudler*, 605 F.2d 488 (10th Cir. 1979), *cert. denied*, 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980); *United States v. Williams*, 573 F.2d 284 (5th Cir. 1978). Here, the district court gave an adequate instruction on partnership income indicating that only a partner's distributive share of the net income of a partnership is taxable to him.[12] It is noted that Thet-

11. Defendant's requested Instruction No. 4 reads as follows:

Although a Partnership is required to file a Partnership Return and compute taxable income on that return, the Partnership, as such, is not subject to income tax. The Partnership is required to include in its return the gross receipts from the business and deductions such as cost of goods sold, cost of operations to determine its gross profit. It then deducts other expense items such as interest, rent, salaries and wages, repairs, depreciation, and so on, in order to determine the profit or loss of the Partnership. The partners of the Partnership are taxable on their distributive shares of the Partnership's profit or loss. A partner should receive a Schedule K–1 from the Partnership which shows his separate share of profit or loss distributable by the Partnership. A partner who is an individual is required to include in income only the net income or loss, and this figure is reported on the individual's return on Schedule E. If a partner is a Corporation, the Corporation's share of net income or loss from the partnership would be reported on the Corporation Income Tax Return Form

1120, as "other income." *Internal Revenue Code of 1954*, §§ 701 and 702, Internal Revenue Service Form 1065 and Internal Revenue Service Instructions to Form 1065, Internal Revenue Service Form 1120, and Internal Revenue Service Instructions Form 1120.

12. The district court's instruction recites, in pertinent part:

For the purposes of the Internal Revenue Code the term "Partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organizations through or by means of which any business, financial operation, or venture is carried on and which is not a corporation, or a trust, or an estate . . . .

A joint venture exists where two or more parties join together to carry on a venture for their common benefit, each contributing property or services and having a community of interest in the profits. A Corporation may be a member of a joint venture.

The income of a partnership or a joint venture after deducting business expenses is not taxed to the partnership organization or to the joint venture itself, but to the individual

ford's counsel was allowed to argue to the jury that the receipts from the Palms Theater were partnership receipts and were not reportable as corporate income to Artex. The jury was therefore allowed to consider this defense. The district court did not abuse its discretion in denying the proposed jury instruction.

## IV. *Obstruction of Justice Violations*

Thetford challenges his conviction for obstruction of justice on Counts Eleven, Twelve, and Thirteen.[13] In its brief before this Court the Government concedes error on Count Thirteen.[14] Remaining at issue is the validity of Counts Eleven and Twelve, against which Thetford makes two contentions.

### A. *Variance Between the Indictment and Jury Charge*

First, Thetford essentially contends that Counts Eleven and Twelve were submitted to the jury on a theory not alleged in the indictment. Thetford was convicted on these two obstruction of justice counts based on evidence that Thetford intimidated and threatened certain Artex employees

in an effort to prevent their communication of information to IRS investigators. Count Eleven involves threats made by Thetford against Jim and Wayne Sharp allegedly in violation of 18 U.S.C. § 1510.[15] Count Twelve involves statements by Thetford to Robert Moore, allegedly in violation of 18 U.S.C. §§ 1510 and 2(b).[16]

Thetford contends that he was prejudiced by an instruction to the jury, which recites, in pertinent part:

In order to find the defendant guilty of the charges contained in Counts Eleven, Twelve, and Thirteen, the Government must prove beyond a reasonable doubt the following essential elements:

(1) An act by the defendant of willfully (a) endeavoring by means of intimidation and threats of force, to prevent the communication of information relating to a violation of the federal criminal laws, or (b) *inflicting bodily injury on any person on account of the giving of any information relating to a violation of the federal criminal laws . . . .* [emphasis supplied].

---

partners or joint venturer of the partnership or joint venture. Thus, the net income of a partnership after being divided between the partners, is taxed to the partners or joint venturers according to their distributive share of the income of the partnership or joint venture. There can be a joint venture between a corporation and an individual or individuals or between two corporations.

**13.** Thetford was also convicted on Count Ten of conspiring with Charles Musick to obstruct justice, in violation of 18 U.S.C. § 1510. Count Ten charged Thetford with conspiring to delay and prevent communication by Robert Moore and Larry Jones to IRS agents, and conspiring to kill Larry Jones on account of his giving information to IRS investigators. The only grounds asserted for reversing Count Ten are the general allegations of error set forth in section V below.

**14.** The Government's brief reads in pertinent part:

The defendant contends that he was prejudiced by the District Court's jury instructions on Counts Eleven, Twelve, and Thirteen, which he claims permitted the jury to consider finding him guilty of having committed acts not charged in the grand jury's indict-

ment . . . . *We concede the correctness of defendant's argument as to Count Thirteen and agree that reversal is warranted on that count . . . .* [emphasis supplied].
See note 18, *infra*.

**15.** Section 18 U.S.C. § 1510 reads in pertinent part:

(a) Whoever willfully endeavors by means of bribery, misrepresentation, intimidation, or force, or threat thereof to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to any criminal investigator . . .
Shall be fined not more than $5,000, or imprisoned not more than five years, or both.

**16.** 18 U.S.C. § 2 reads as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
(b) Whoever willingly causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

Thetford contends that subsection (b) of the instruction was not contained in the indictment, and that its inclusion in the submission to the jury permitted it to convict him of acts for which he was not charged.

■ Of course, a defendant may not be tried on charges not contained in the indictment. *Stirone v. United States*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). In *Stirone*, the indictment charged the defendant with interfering with interstate commerce by using his position as a union officer to obstruct the movement of building materials to a construction site in Pennsylvania. The trial court, in its jury instructions, informed the jury that it could convict the defendant if it found that he had interfered with the movement of building materials into Pennsylvania *or*, if it found that the defendant's interference with the construction of a steel mill in Pennsylvania had impeded the flow of steel to other states. In the Supreme Court's view the addition of this second alternative, over the defendant's objection, permitted the jury to convict the defendant on a charge other than that returned by the grand jury. As the Supreme Court noted:

> Here, . . . we cannot know whether the grand jury would have included in its indictment a charge that commerce in steel from a nonexistent steel mill had been interfered with. <u>Yet, because of the court's admission of evidence</u> and under its charge this might have been the

basis upon which the trial jury convicted the petitioner. If so, he was convicted on a charge the grand jury never made against him. This was fatal error.

80 S.Ct. at 274 (underlining supplied).

In the instant case the district court's instructions might appear to permit the jury to consider the question of bodily harm, a factor not included in the indictment. Unlike *Stirone*, however, there was no objection to the jury instruction given [17] and, significantly, there was no evidence admitted as to Counts Eleven and Twelve that could remotely be construed to support an inference that Jim Sharp, Wayne Sharp, or Robert Moore had been bodily harmed by Thetford.[18]

■ The instruction to the jury in the instant case is clearly distinguishable from that requiring reversal under *Stirone*; it is harmless and does not constitute plain error under the standard set forth in *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[19]

B. *Sufficiency of Evidence on Count Eleven*

■ Count Eleven charges Thetford with obstructing, delaying, and preventing the communication of information by Jim Sharp and Wayne Sharp to IRS investigators by making an intimidating and threatening statement to Jim Sharp, in violation

---

17. The defendant cites several recent cases in which this and other courts have construed the *Stirone* decision. *See United States v. Bizzard*, 615 F.2d 1080 (5th Cir. 1980); *United States v. Salinas*, 601 F.2d 1279 (5th Cir. 1979), amended, 610 F.2d 250 (1980); *United States v. Carroll*, 582 F.2d 942 (5th Cir. 1978); *United States v. Carlson*, 616 F.2d 446 (9th Cir. 1980); *United States v. Smolar*, 557 F.2d 13 (1st Cir. 1977). However, none of these cases hold that, in the absence of evidence upon which the jury might have convicted on a ground not contained in the indictment, the defendant's conviction should be reversed. In the absence of such evidence, the court's inadvertent addition of the instruction contained in the charge is "trivial, useless [or] innocuous." *See Stirone*, 80 S.Ct. at 273.

18. The jury convicted Thetford on Count Thirteen for obstructing justice by making intimi-

dating statements and threats of force to Larry Jones, in violation of 18 U.S.C. § 1510 and 2(b). Jones, a one-time manager of Thetford's Fort Worth theater, was killed on November 28, 1976. In Count Ten, the jury convicted Thetford of conspiring with Musick to kill Jones, in violation of 18 U.S.C. § 371. Thus, the jury may have considered the bodily-injury section of the jury instruction when convicting Thetford on Count Thirteen. As noted, the Government has conceded a fatal variance between the indictment and the jury instructions on Count Thirteen. This Court therefore reverses Thetford's conviction on Count Thirteen.

19. Plain error exists only if it affects substantial rights of a party so basic that the infraction can never be treated as harmless error. *Chapman*, 87 S.Ct. at 827–28.

of 18 U.S.C. § 1510. Evidence was presented that Thetford met Jim Sharp at a hardware store in 1979, told Sharp that he and his brother were the people that were hurting his tax case the most, and then stated "you people are going to learn to quit f_____ with me." Sharp testified that this statement scared him because Thetford had used almost identical language in 1971 against Musick. Thetford at that time armed the theater managers with guns in case Musick tried to take over Thetford's theaters.

It was incumbent on the prosecution to establish that Thetford knew or reasonably believed that Jim Sharp and Wayne Sharp had information which they would transmit to the IRS and that Thetford's quoted statement was an effort to obstruct further communication. In the light most favorable to the Government, the evidence shows that Jim Sharp and Wayne Sharp had cooperated with IRS agents investigating Thetford and Artex in 1976. Thetford was aware of this criminal investigation virtually from its outset and had retained an attorney specifically to represent him during the investigation. In 1979, Thetford was informed by his attorney that the Sharp brothers were potential witnesses against him in the criminal case, particularly regarding unreported income from the Livingston and Palms Theaters. It was soon thereafter, in June 1979, that Thetford encountered Jim Sharp in the hardware store and made the statement which Sharp took as a threat.

Thetford argues that this statement was, if anything, a threat only of retaliation and did not provide a basis for the jury to infer that it was an attempt to deter *future* communications.[20] In the instant case, however, there is substantial evidence to support what was apparently the jury's inference that the statement was made to deter future communications. Thetford had been informed that the Sharp brothers were potential witnesses against him and believed that they presently were "hurting his case the most." The investigation was ongoing and the jury could reasonably conclude that the defendant's comment to Jim Sharp was intended to thwart future communications with the IRS investigators. Accordingly, the evidence was sufficient to convict Thetford on Count Eleven.

## V. *Other Assignments of Error*

Finally, Thetford challenges the district court's rulings on three motions during the trial: (1) denial of defendant's motion to reopen testimony to impeach a key Government witness on the obstruction of justice allegations; (2) admission of prejudicial evidence for impeachment purposes; and (3) failure to include the specifics of the Bill of Particulars in the jury charge.

### A. *Denial of Thetford's Motion to Reopen Testimony*

Charles Musick was one of forty-four witnesses called during nine days of testimony and he had provided particularly important testimony relating to obstruction of justice charges. The defendant made a strong effort to impeach Musick by showing he had tried to take over Thetford's theater chain

---

**20.** A simple retaliatory threat is not covered by 10 U.S.C. § 1510 if there is "no basis whatever in the record for the jury to infer that the purpose of the [statement] was to deter *future* communications." (emphasis in original). *United States v. San Martin*, 515 F.2d 317, 321 (5th Cir. 1975). In *San Martin*, the son of a man subpoenaed by the FBI called the mother of two informants who had given the FBI the father's location and told her: "Well, they [the complainant's daughters] have caused my father to get a subpoena and you've seen 'em for the last time." 515 F.2d at 320. The Court ruled that the statement was merely a threat of retaliation, because the only evidence the threatened mother could have possessed had already been communicated to the FBI.

*San Martin* was distinguished by this Court in *United States v. Koehler*, 544 F.2d 1326, 1329 (5th Cir. 1977). In *Koehler* there was evidence from which the jury reasonably could have concluded that in addition to retaliation for past communications to investigators the purpose of meeting an informant was to prevent further communications. The Court noted that the informant still posed a threat to the defendant, having additional information to convey, and the defendant expected as much. *Id.*

in 1971, a charge which Musick denied. The day after the close of his case-in-chief, Thetford's counsel stated that he had been informed on the previous evening that Thetford's ex-wife had found a taped conversation between Tom Johnson, an employee of Thetford's Fort Worth theater, and Musick. In this taped conversation Musick was reputed to have said, "I know Thetford's habits and weaknesses and strength better than anybody. I put him where he is and I've taken away what he had so I'm the one that, you know, you'd better come in with." Thetford's counsel moved to reopen testimony to introduce this evidence, but the district court denied the motion. Thetford contends the district court abused its discretion because the tape would have substantially undermined the credibility of Musick.

A motion to reopen is clearly within the discretion of the trial court. In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion. The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not "imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered." *United States v. Larson*, 596 F.2d 759, 778 (8th Cir. 1979). In the instant case, the district court concluded that the additional evidence was of little probative value in establishing Musick's propensity to use strong-arm tactics. The tape in issue was purported to involve a conversation which occurred in 1971, when Musick and Thetford were on the "outs." Since 1971, Musick and Thetford had engaged in a series of reconciliations and disputes.[21] In addition, the testimony on the tape was cumulative, because evidence was already before the jury on Musick's propensity to use strong-arm tactics. Finally, defense counsel had apparently known about the tapes but did not request a search for them because he assumed they were lost. There is no basis for concluding that the district court abused it discretion in denying the motion.

### B. *Abuse of Discretion in Admitting a Rifle Illustration as Evidence*

As part of his testimony Musick was relating his long association with Thetford and described an incident which occurred in Dallas in 1970. Thetford and Musick were chasing an automobile containing two men they suspected of burglarizing their apartment. Musick testified he repeatedly shot at the fleeing car with a Browning 9 mm. pistol furnished by Thetford, but only at Thetford's orders and after he had been given the pistol by Thetford. Thetford sought to impeach Musick's credibility by disclaiming ownership of the pistol used on that occasion. Thetford further detailed how shocked he was at Musick's behavior in that incident. On Thetford's cross-examination he adhered to his testimony that he did not hand Musick the pistol and insisted that Musick owned his own Browning. Thetford added that he and Musick would buy guns and trade them back and forth. Thetford then stated that he did not think he had purchased the pistol used to shoot at the car, but admitted he had purchased two or three 9 mm. pistols. Focusing on the pistols, the Government inquired as to what

---

**21.** In 1972 Thetford rehired Musick to manage three New Orleans theaters and Musick continued in Thetford's employment from 1972 to 1974. During this period, Musick visited Thetford in Dallas, acted as bodyguard, and "drank and partied" with him. In 1973, he accompanied Thetford and Wayne Sharp to Florida where they opened the Palms Theater. Then in 1974, Musick opened a theater in Dallas in competition with Thetford, as a result of which Thetford arranged to have Musick arrested, leading Musick to threaten to blow Thetford's head off. However, two years later, in early 1976, Thetford once again hired Musick, this time to run his Dallas theaters, and Musick continued to work for the defendant until mid-1977.

firearms Thetford owned at the time period. Thetford stated he bought his firearms at Ray's Hardware, but could not recall how many 9 mm. Browning automatics he had bought there. It was at this point that the Government introduced the record of Thetford's weapon purchases at Ray's Hardware. The record showed that Thetford purchased two Browning pistols a month before the shooting incident and a third the following spring. The records also revealed that Thetford purchased two Python 357 magnums, three .45 caliber pistols, and an AR–180 rifle. The illustration of the AR–180 rifle, which looked like a machine gun, was attached to the purchase record.

When the credibility of a witness is placed in issue the district court has broad discretion concerning the extent to which cross-examination may exceed the scope of direct examination. *United States v. Contreras*, 602 F.2d 1237 (5th Cir.), *cert. denied*, 444 U.S. 971, 100 S.Ct. 466, 62 L.Ed.2d 387 (1979).[22] When a defendant chooses to testify, he makes an issue of his credibility and the Government is allowed to cross-examine the defendant with respect to matters about which he has testified. *United States v. Dooley*, 587 F.2d 201 (5th Cir.), *cert. denied*, 440 U.S. 949, 99 S.Ct. 1430, 59 L.Ed.2d 639 (1979); *United States v. Caron*, 474 F.2d 506 (5th Cir. 1973). The defendant here, by his attorney's cross-examination of Musick and by Thetford's direct testimony placed in issue the shooting incident, the weapon used therein, and Thetford's shock and surprise at Musick's use of force. The Government's attempted impeachment was not improper.

The only question is whether the prejudicial effect of the illustration of the rifle substantially outweighed its probative value. Even if its introduction was prejudicial and an abuse of discretion, this Court concludes that the error was harmless. *Chapman v. California*, 87 S.Ct. at 828; *Fahy v. State of Connecticut*, 375 U.S. 85, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963). In light of all the other evidence to support

Thetford's conviction, there is no reasonable possibility that this evidence might have contributed to the conviction in an independent manner. Accordingly, this Court declines to reverse any counts of the conviction on the basis of the introduction of the AR–180 rifle illustration.

### C. *Bill of Particulars*

Thetford finally raises the allegation that Counts Seven, Eleven, Twelve, and Thirteen of the conviction should be reversed because the district court failed to include the Government's Bill of Particulars in its charge to the jury. However, several courts have explicitly ruled that failure to include the Bill of Particulars is not error. *United States v. Francisco*, 575 F.2d 815 (10th Cir. 1978); *Pipkin v. United States*, 243 F.2d 491 (5th Cir. 1957). Thetford's allegation is precluded.

### VI. *Conclusion*

The convictions on Counts Four through Twelve are affirmed. The conviction on Count Thirteen must be reversed and, accordingly, the cause remanded to the district court for appropriate sentencing.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

22. *Contreras* holds that Rule 608 of the Federal Rules of Evidence does not preclude Government cross-examination aimed at testing the credibility of defendant's direct testimony by reference to conduct that is factually related to that testimony. 602 F.2d at 1242.