UNITED STATES of America,
Plaintiff–Appellee,

v.

Benjamin Shabazz PEAY,
Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

James Robert FORD, Defendant–
Appellant.

Nos. 91–5045, 91–5055.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1992.

Decided Aug. 7, 1992.

As Amended Sept. 3, 1992.

Beth Harshman, Allen Holt Gwyn, Jr., Patton, Boggs & Blow, Greensboro, N.C., argued (Gregory Davis, Winston–Salem, N.C., for defendant-appellant Ford), for defendants-appellants.

David Bernard Smith, Asst. U.S. Atty., Sr. Litigation Counsel, Greensboro, N.C., argued (Robert H. Edmunds, Jr., U.S. Atty., on brief), for plaintiff-appellee.

Before WIDENER and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

## OPINION

BUTZNER, Senior Circuit Judge:

A jury convicted Benjamin Shabazz Peay of conspiracy to distribute cocaine, possession with intent to distribute cocaine, possession with intent to distribute heroin, use of a firearm during and in relation to a drug trafficking offense, engaging in a continuing criminal enterprise, laundering drug currency, and engaging in transactions involving money derived from the sale of drugs.

Peay appeals on numerous grounds. We find that the trial court erred in allowing the prosecution to reopen its case after the close of the evidence without allowing Peay to present a witness in rebuttal. We therefore vacate the judgment and remand his case for a new trial on counts 1–6. The government confessed error on count 7 (monetary transactions).

James Robert Ford, one of Peay's codefendants, appeals his conviction of conspiracy to distribute cocaine. We affirm the judgment against Ford.

### Benjamin Shabazz Peay

#### I

Peay's primary assignment of error pertains to the trial court's permitting the government to reopen its case after the close of all the evidence. Peay insists that the court magnified this error by not allowing him to call a witness in rebuttal.

Harvis Patterson, a government witness, had pled guilty to conspiring with Peay to distribute cocaine and was awaiting sentencing. Patterson's testimony incriminated Peay.

Peay testified, denying all the charges. He then called James Seagers, who was being held in jail because of unrelated crimes. Seagers testified that Patterson had told him that Peay was no good and that he (Patterson) was not going to tell the truth. Peay subsequently rested his case, and the court recessed for lunch.

When the court reconvened, the prosecutor moved to reopen the government's case by calling Seagers. The prosecutor explained that during the luncheon recess Seagers said he wanted to testify about conversations he had with Peay while they were both in the Guilford jail. The prosecutor vouched that the testimony was relevant to the merits of the case. The court granted the government's motion.

Peay's counsel then requested leave to call Terrell Rainer, another inmate of the Guilford jail, who, counsel was informed, could rebut Seagers and testify that Seagers was coming back to vent his anger against Peay. The court denied leave to

call Ranier. Peay later supplemented the proffer of Rainer's proposed testimony as follows:

> Mr. Rainer had told me last week that he had talked to Mr. Seagers and Seagers had told him that, once I subpoenaed him [Seager] to court, he was going to double cross me in order to help himself as far as his substantial assistance to the Government. But I told him [Rainer] at the time I didn't think that he [Seagers] would ask me to subpoena him and then tell a lie.

A note Seagers wrote to the judge saying he wanted to testify for Peay corroborates Peay's assertion that Seagers wanted to be subpoenaed.

Seagers testified that Peay had told him about going to New York for a drug transaction. Seagers also testified that Peay said he had a drug selling operation in Winston–Salem and his drug runners were selling approximately $10,000 worth of drugs each week.

Peay then took the stand and denied having the conversations that Seagers had related. His request to call Ranier in rebuttal having been denied, the trial proceeded with the attorneys' arguments to the jury.

## II

"The reopening of a criminal case after the close of evidence is within the discretion of the trial judge." *United States v. Paz*, 927 F.2d 176, 179 (4th Cir.1991). We therefore review the district court's decision to reopen the case for abuse of discretion. *Paz*, 927 F.2d at 179. *See also United States v. Carter*, 569 F.2d 801, 803 (4th Cir.1977). Criteria for reopening a case have been explained in *United States v. Thetford*, 676 F.2d 170, 182 (5th Cir.1982) (*quoting United States v. Larson*, 596 F.2d 759, 778 (8th Cir.1979)), as follows:

> In exercising its discretion, the court must consider the timeliness of the motion, the character of the testimony, and the effect of the granting of the motion. The party moving to reopen should provide a reasonable explanation for failure to present the evidence in its case-in-

chief. The evidence proffered should be relevant, admissible, technically adequate, and helpful to the jury in ascertaining the guilt or innocence of the accused. The belated receipt of such testimony should not "imbue the evidence with distorted importance, prejudice the opposing party's case, or preclude an adversary from having an adequate opportunity to meet the additional evidence offered."

*See also United States v. Bayer*, 331 U.S. 532, 537–39, 67 S.Ct. 1394, 1396–98, 91 L.Ed. 1654 (1947); *United States v. Walker*, 772 F.2d 1172, 1177 (5th Cir.1985).

The motion to reopen was timely. The government presented a reasonable explanation for not presenting the evidence earlier, as Seagers did not approach the prosecutor until after the close of the evidence. The testimony was relevant and helpful to the jury.

Seagers' testimony after the government reopened its case undoubtedly strengthened the prosecution. Prior to the admission of Seagers' testimony the government's case in chief rested largely on the testimony of Peay's indicted coconspirators who had pled guilty and were awaiting sentence or unindicted coconspirators who cooperated with the government. Peay had taken the stand in his own defense and denied any involvement with drugs. Peay's admission of guilt, which was the subject of Seagers' testimony, contradicted Peay's defense and corroborated the government's witnesses. Moreover, Seagers' testimony about Peay's admission of guilt was presented to the jury at a most critical time, shortly before the attorneys' summations.

Denial of Peay's request to impeach Seagers by calling Ranier as a witness prejudiced Peay. The danger caused by a witness who seeks to curry favor with the government is ever present. Ranier's purported testimony that Seagers planned to double cross Peay is not beyond the realm of possibility; in fact, that appears to be what happened.

The trial court denied Peay's request before Seagers testified. Therefore, it is of no moment that Peay's counsel did not question Seagers during cross-examination about the statement he allegedly made to Ranier. Counsel had no reason to lay a foundation for impeachment testimony after the court ruled it would not grant Peay leave to call the witness who would give such testimony. Moreover, the lack of cross-examination would not have barred subsequent admission of Ranier's testimony.

The familiar foundation requirement that an impeaching statement first be shown to the witness before it can be proved by extrinsic evidence is preserved but with some modifications. The traditional insistence that the attention of the witness be directed to the statement on cross-examination is relaxed in favor of simply providing the witness an opportunity to explain and the opposite party an opportunity to examine on the statement, with no specification of any particular time or sequence.

Fed.R.Evid. 613(b) advisory committee's note (citation omitted); *see also* 3 Weinstein and Berger, *Evidence* ¶ 613[02], at 613–11 (1991).

An important criterion for properly reopening a case is taking care that reopening does not "preclude an adversary from having an adequate opportunity to meet the additional evidence offered." *Thetford,* 676 F.2d at 182. The court's reopening of the government's case while at the same time denying Peay an opportunity to impeach Seagers with Ranier's testimony sustains Peay's assignment of error. The judgment must be vacated and the case remanded for retrial.

### III

Although we have set aside Peay's conviction, we will discuss briefly issues that will arise again on retrial. The indictment charged Peay with money laundering in violation of 18 U.S.C. § 1956. Proof of some effect on interstate commerce is essential to show such a violation.

Peay used funds on deposit in federally insured banks to purchase some real estate. The only proof offered by the government to show an effect on interstate commerce was that the banks were insured by the Federal Deposit Insurance Corporation (FDIC). The court instructed the jury that proof of this insurance allowed them to infer the existence of an effect on interstate commerce. Peay argues that this evidence is insufficient to show such an effect and that the court's instruction was erroneous.

Neither the government nor Peay has cited a case precisely on point. Nevertheless, we conclude that precedent supports the district court's conclusions. A statutory requirement that an activity "affect commerce" indicates a desire by Congress to exercise all power conferred by the Commerce Clause. *See Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985) (using an explosive device to maliciously damage and destroy property used in an activity affecting interstate commerce); *Scarborough v. United States,* 431 U.S. 563, 571–72, 97 S.Ct. 1963, 1967–68, 52 L.Ed.2d 582 (1977) (possession of a firearm); *National Labor Relations Board v. Reliance Fuel Oil Corp.,* 371 U.S. 224, 226, 83 S.Ct. 312, 313–14, 9 L.Ed.2d 279 (1963) (National Labor Relations Act); *United States v. Lomax,* 598 F.2d 582, 584 (10th Cir.1979) (fraudulent use and transportation of stolen credit card). The phrase "in any way or degree" also signifies that Congress intends to exercise its broadest authority. *See Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960) (Hobbs Act). We therefore hold that, in enacting § 1956, Congress intended to exercise the full legislative power conferred by the commerce clause. Only a *de minimis* effect on interstate commerce must be shown for the application of such a statute to pass constitutional muster. *United States v. Spagnolo,* 546 F.2d 1117, 1119 (4th Cir. 1976).

*United States v. Voss,* 787 F.2d 393, 397 (8th Cir.1986), on which Peay relies, involved an alleged violation of 18 U.S.C.

§ 844(i), which forbids malicious destruction of property that affects interstate commerce. The court in *Voss* found that the *de minimis* requirement was not met if the only effect the property had on interstate commerce stemmed from its being insured by a carrier that also did business in another state.

The activities of an FDIC-insured institution, however, affect interstate commerce more than property insured by a private carrier. As noted by the district court, the government insurance is federally administered, federal officials periodically examine the accounts, and the reports sent to the FDIC deal with money that has been deposited from many sources, including those outside the state.

In *Westfall v. United States*, 274 U.S. 256, 47 S.Ct. 629, 71 L.Ed. 1036 (1927), the Court observed that a transaction in a member bank of the Federal Reserve System affects the system. This is true, the Court said, even if the transaction causes no loss to the System. 274 U.S. at 258–59, 47 S.Ct. at 629–30. There is no principled reason why these observations do not also apply to the FDIC, sustaining the proposition that a transaction in an insured bank affects the FDIC. Congress created the FDIC to "keep open the channels of trade and commercial exchange." *Weir v. United States*, 92 F.2d 634, 636 (7th Cir.1937). It is apparent, therefore, that a transaction that affects the FDIC affects interstate commerce.

Because Congress intended to reach all cases within its legislative power when it enacted § 1956, and because transactions involving financial institutions insured by the FDIC affect interstate commerce, we find no error in the district court's instructions to the jury that it could infer an effect on interstate commerce by the banks' status as FDIC-insured institutions.

■ Peay also contends that the evidence is insufficient to sustain his conviction for use of a firearm during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1). Federal agents found a number of weapons while executing search warrants of Peay's house and office where he conducted drug transactions. The jury specified that he was guilty only with respect to three loaded guns found in his bedroom, including an Uzi. A government witness testified that he saw the Uzi in the room where Peay was cutting cocaine.

*United States v. Brockington*, 849 F.2d 872, 876 (4th Cir.1988), explains that a firearm is used in violation of § 924(c)(1) "if the firearm is present for protection and to facilitate the likelihood of success, whether or not it is actually used." Measured by this standard the evidence was sufficient, and Peay's assignment of error on this issue lacks merit.

The basis of Peay's complaint about enhancement of his sentence is not likely to reoccur on retrial.

The government has confessed error with respect to the sufficiency of the evidence to support a conviction on count 7, which charged a violation of 18 U.S.C. § 1957. On remand the district court should enter a judgment of acquittal on this count.

### James Robert Ford

### IV

■ Ford, one of Peay's coconspirators who was tried separately, asserts that the trial court erred in allowing the introduction into evidence of weapons seized from Peay's residence. Ford, relying on Federal Rules of Evidence 401, 402, and 403, contends that inasmuch as he was not charged with using a gun in relation to a drug transaction, the introduction of the weapons and the testimony about their seizure from Peay was irrelevant and unduly prejudiced him.

Witnesses described Ford as a lookout for Peay and as one of the drug organization's lieutenants. Evidence placed him frequently at Peay's residence where the guns were kept and where Peay conducted drug transactions.

Before admitting the weapons, the court, noting the large size of the drug organization, the use of bodyguards, and evidence

of violence, determined that the prejudice to Ford did not outweigh the probative value of the evidence. We review evidentiary decisions by a trial court for abuse of discretion. *United States v. Zandi,* 769 F.2d 229, 237 (4th Cir.1985).

*United States v. Crespo de Llano,* 838 F.2d 1006, 1018 (9th Cir.1987), like this case, involved the admissibility of weapons seized from a coconspirator's house. The court found no error in the trial court's admission of these weapons into evidence, noting that evidence existed linking the defendant to the house from which the weapons were seized. *See also United States v. Zarintash,* 736 F.2d 66, 72 (3d Cir.1984); *United States v. Mourad,* 729 F.2d 195, 201 (2d Cir.1984).

We find no error in the admission of the evidence and affirm the judgment convicting Ford.

Peay—No. 91–5045—Counts 1–6, VACATED; Count 7 REVERSED; REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

Ford—No. 91–5055—AFFIRMED.

LUTTIG, Circuit Judge, concurring in part and dissenting in part:

I concur in Part IV of the court's opinion, affirming appellant Ford's conviction, and in Part III to the extent that it reverses the district court and orders it to enter a judgment of acquittal on count 7 of Peay's indictment. I dissent, however, from the remainder of the court's opinion in which it vacates Peay's conviction on counts 1 through 6 of the indictment and remands for a new trial. Though I agree that the district court erred in allowing the government to reopen its case while denying Peay the opportunity to impeach Seagers by calling Rainer, I would hold that that error was harmless.*

Harmless error analysis is necessarily fact-specific. The standard for harmlessness of nonconstitutional error is "whether we, in appellate review, can say 'with fair

assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" *United States v. Urbanik,* 801 F.2d 692, 698 (4th Cir.1986) (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)). It must be "'highly probable that the error did not affect the judgment.'" *Id.* at 699 (quoting *United States v. Nyman,* 649 F.2d 208, 212 (4th Cir.1980), in turn quoting Traynor, *The Riddle of Harmless Error* 34–35 (1970)); *accord United States v. Vogt,* 910 F.2d 1184, 1193 (4th Cir.1990), *cert. denied,* ——U.S. ——, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991). Similarly, in *United States v. Davis,* 657 F.2d 637 (4th Cir.1981), we explained that "[t]he test for harmlessness for nonconstitutional error is whether it is probable that the error could have affected the verdict reached by the particular jury in the particular circumstances of the trial." *Id.* at 640 (citing *Nyman* and *Kotteakos*).

Three factors guide the inquiry into harmlessness, the "closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Nyman,* 649 F.2d at 212; *see also Urbanik,* 801 F.2d at 699 (quoting *Nyman*); *Gaither v. United States,* 413 F.2d 1061, 1079 (D.C.Cir.1969). The closeness of the case is "the single most important factor, because it provides the central safeguard against reversals for purely 'technical' error." *Urbanik,* 801 F.2d at 699. Here, the issue affected by the error was central to the case, and few, if any, steps were taken to mitigate the effect of the error. By no stretch of the imagination, however, can this case be considered a close one, given the overwhelming evidence of Peay's guilt. In my view, it is not at all "probable that the error could have affected the verdict reached by the particular jury in the particular circum-

---

* The government did not argue harmless error in its submissions to this court. At argument, however, counsel for the government took the position that any error was harmless. In any event, we may raise this issue on our own initiative. *See, e.g., United States v. Pryce,* 938 F.2d 1343 (D.C.Cir.1991); *United States v. Giovannetti,* 928 F.2d 225 (7th Cir.1991).

stances of the trial." *Davis*, 657 F.2d at 640.

At least three witnesses—not including Patterson or Seagers—testified that Peay was the leader of a sophisticated and widespread drug organization. These witnesses included Cassandra Williams, Robert Williams, and Cathy Harris Torry. Cassandra Williams testified that Peay sometimes paid her personally for her activities in the drug ring, J.A. at 68; that Peay provided her with the headsets and walkie-talkies used in the drug activities, *id.* at 69; that she, as one of Peay's "lieutenants," would receive from him drugs to sell, *id.* at 72; and that she would phone Peay when she had run out of drugs to sell, *id.* at 81. Similarly, Robert Williams, another of Peay's "lieutenants," testified that Peay gave him a job selling cocaine, *id.* at 89; that Peay paid him for his activities, *id.* at 92; that he had retrieved and prepared cocaine with Peay on numerous occasions, *id.* at 95–97; and that he had seen Peay preparing cocaine in his house surrounded by various firearms, *id.* at 98. A sample of testimony of Cathy Harris Torry, yet another of Peay's "lieutenants," is typical of the powerful evidence of Peay's guilt that was heard by the jury:

Q. After he [Peay] asked you to become lieutenant, what did you do?

A. I held the money and gave the guys the drugs to sell.

Q. Who did you receive the drugs from that you gave out?

A. Ben Peay.

Q. How often did you see Mr. Peay?

A. Every day.

Q. Would it be on one or more occasion during the day?

A. Two or three times a day.

Q. What size packages would you receive on those occasions?

A. A thousand-dollars package, which is a hundred dime bags.

*Id.* at 102–03. In addition to the testimony from Cassandra Williams, Robert Williams and Cathy Torry, the fruit of a search of Peay's residence, which was introduced into evidence, included the standbys of the drug dealer: cash, guns, drugs, and drug

paraphernalia. *Id.* at 145–67. None of this testimony was impeached by Seagers; nor would any of it have been impeached by Rainer.

Based upon this evidence, I am convinced that the district court's error was harmless. Even assuming that Rainer's testimony would have negated Seagers' (second) testimony and that Seagers' (first) testimony negated Patterson's testimony, there was still overwhelming evidence of Peay's guilt of the drug and drug-related offenses charged. Accordingly, I would affirm Peay's conviction on these charges in all respects.