SYLVESTER CORRIGAN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Corrigan v. Commissioner
Docket No. 11187-89
United States Tax Court
T.C. Memo 1994-31; 1994 Tax Ct. Memo LEXIS 36; 67 T.C.M. (CCH) 2024; January 26, 1994, Filed *36 R determined income tax deficiencies against P for 1981 and 1982 using the net worth plus expenditures method. P took money from his corporation. The notice of deficiency was sent to P more than 3 years after he filed his tax returns for 1981 and 1982. 1. Held: The statute of limitations does not bar the assessment and collection of tax for 1981 and 1982. Sec. 6501(c)(1), I.R.C. 1954. 2. Held, further, P is liable for additions to tax for civil fraud for 1981 and 1982. Secs. 6653(b) and 6653(b)(1), I.R.C. 1954. 3. Held, further, P is liable for an additional addition to tax for 1982 based on the portion of the deficiency attributable to fraud; amount determined. Sec. 6653(b)(2), I.R.C. 1954. 4. Held, further, amounts of deficiencies determined. 5. Held, further, P is liable for an addition to tax for substantial understatement of income tax for 1982. Sec. 6661(a), I.R.C. 1954. For petitioner: John Kennedy Lynch. For respondent: Dawn Marie Krause and Anita A. Gill. MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: Respondent determined deficiencies in Federal individual income tax and additions to tax under sections *37 6653(b)[1] (fraud) and 6661 (substantial understatement of income tax) against petitioner as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6653(b)(1)
Sec. 6653
Sec. 6661(a)
(b)(2) 1981
$ 29,440
$ 14,720
-- --
-- 1982
62,160
-- $ 31,080
[1]
$ 15,540
After concessions by both sides, the issues for decision are as follows: (1) Whether the assessment and collection of deficiencies for 1981 and 1982 are barred by the statute of limitations, sec. 6501(a), or are allowed under the fraud exception, sec. 6501(c)(1), to the general period of limitations; (2) If assessment and collection are not barred for either 1981 or 1982, then, for that year -- (a) whether petitioner is liable for civil fraud additions to tax under section 6653(b) (for 1981) and under sections *38 6653(b)(1) and 6653(b)(2) (for 1982) and, as to section 6653(b)(2) in what amount; (b) what is the amount of petitioner's unreported gross income; and (c) whether petitioner is liable for an addition to tax for 1982 under section 6661 for a substantial understatement of income tax.
FINDINGS OF FACT When the petition was filed in the instant case, petitioner resided in Cleveland, Ohio. Petitioner was the sole shareholder of Sy's, Inc. (hereinafter sometimes referred to as Sy's), an Ohio corporation. During 1981 and 1982, Sy's operated an ice manufacturing and sales business under the name of Corrigan Ice. Petitioner is a widower with seven children. In 1981, the four youngest children lived with him. They were Daniel, Shawn, Brian, and Patricia, and they ranged in age from 23 to 11. Brian and Patricia lived with petitioner in 1982. Judith L. Pawlak (hereinafter sometimes referred to as Pawlak), petitioner's girlfriend [2] at that time, also lived with petitioner during the years in issue. *39 Petitioner began a beverage business in 1953. Sy's was incorporated on August 11, 1966. At some point, petitioner transferred the beverage business to Sy's. Sy's expanded into an ice business in the late 1970's. In 1980 the businesses suffered losses from a fire. After the fire, Sy's sold the beverage license, and the ice business became its only business. Corrigan Ice was located at 5510 Bridge Avenue, Cleveland, Ohio. In 1981 petitioner's residence (hereinafter sometimes referred to as the Bridge Avenue house) was located at the same address, and was next door to the business. During 1981 and 1982 petitioner used the Bridge Avenue house for bookkeeping for Corrigan Ice and for business phone calls. In the vestibule of the Bridge Avenue house there was a desk and file cabinet which were used for business purposes. Petitioner owned the Bridge Avenue house and the other property at that address. Petitioner's cost basis in each of the improvements at that address was as shown in table 1. Table 1 Improvement
Basis
Concrete ice building
$ 7,500
Ice house
30,000
Bridge Avenue house
8,400
Petitioner rented the property at that address (including the Bridge *40 Avenue house) to Sy's for $ 6,000 in 1981, and $ 9,600 in 1982. On his tax return, petitioner claimed straight-line depreciation for each of the three improvements listed in table 1. He depreciated the ice house at 6-2/3 percent per year, and each of the other improvements at 4 percent per year. Petitioner did not allocate his basis on the Bridge Avenue house as between (1) his and his household's personal use and (2) Sy's' business. Respondent does not disallow any part of this claimed depreciation. [3]
*41 In 1978 Francis J. Dempsey (hereinafter sometimes referred to as Dempsey), Sy's' accountant, sent a letter to petitioner (as president of Sy's), instructing petitioner to maintain a corporate cash journal, to deposit all cash belonging to Sy's into a corporate checking account, and to keep a personal checking account separate from Sy's' business account. Sy's had a corporate checking account and a separate corporate savings account at Union Commerce Bank. Also, on several occasions before 1981, Dempsey told petitioner to deposit all Corrigan Ice sales receipts into the corporate checking account, because Dempsey used the deposits as the gross receipts in preparing Sy's' income tax returns. Dempsey instructed petitioner how to keep payroll records, petty cash records, and other corporate records for Sy's. Dempsey told petitioner that Sy's should pay wages by check rather than by cash. Petitioner did not follow these instructions. Dempsey prepared the 1981 and 1982 tax returns for both petitioner and Sy's. Pawlak maintained the business records of Corrigan Ice, to the extent that any such records were maintained. During the years in issue, Corrigan Ice had four or five trucks *42 which were used to deliver ice, and had a driver for every truck. Corrigan Ice also employed several employees who manufactured and bagged the ice. Sy's reported no salary and wage payments to employees other than petitioner on its 1981 tax return; it reported $ 6,500 salary and wage payments to employees other than petitioner on its 1982 tax return. There was not a cash receipts journal for Corrigan Ice. Petitioner kept cash belonging to Corrigan Ice in boxes in the desk and file cabinet inside the Bridge Avenue house. Petitioner never had a safe in his house or at the business location of Corrigan Ice. Some of Corrigan Ice's retail and wholesale customers paid Corrigan Ice in cash. Generally, on Sundays, Daniel Corrigan, one of petitioner's sons, paid the employees of Corrigan Ice in cash from a box in the file cabinet. Corrigan Ice cash was sometimes used to pay for gasoline for the trucks, or to reimburse drivers who paid for gasoline or other truck expenses. Also, sometimes substantial amounts of Corrigan Ice cash was used to pay for equipment for Sy's. Some cash was deposited into Corrigan Ice's checking account -- about $ 21,400 in 1981 and about $ 13,500 in 1982. *43 After the years in issue, about 50-60 percent of the Corrigan Ice receipts were by check, and the rest in cash. During 1981 and 1982 Diane Dvornicky (hereinafter sometimes referred to as Dvornicky), a cashier at a Pick-N-Pay grocery store, cashed 465 checks, all payable to Corrigan Ice, for petitioner. Dvornicky cashed Corrigan Ice checks totaling $ 41,815.48 in 1981 and $ 36,637.42 in 1982. [4] Also during 1981 and 1982, Peter Caroballo (hereinafter sometimes referred to as Caroballo), the owner of Pete's Union 76 gas station in Cleveland, cashed 621 checks, all payable to Corrigan Ice, for petitioner. Caroballo cashed Corrigan checks totaling $ 18,739.10 in 1981 and $ 49,796.64 in 1982. [5]
*44 During 1981 and 1982 petitioner had a savings account at Union Commerce Bank. [6] Petitioner's savings account had balances of $ 116.16, $ 124, and $ 130, on January 1, 1981, December 31, 1981, and December 31, 1982, respectively. On January 4, 1982, petitioner opened a personal checking account at Union Commerce Bank. During the latter half of 1982, petitioner deposited four checks payable to Corrigan Ice, totaling $ 9,705.56, into this personal checking account. During 1981 and 1982 Sy's had a corporate checking account at Union Commerce Bank. Petitioner used this account for personal expenses as well as business expenses. It was the policy of Union Commerce Bank to not cash checks payable to corporations; such checks were to be deposited into a corporate account. However, petitioner cashed checks payable to Corrigan Ice, totaling $ 68,296.63 in 1981 *45 and $ 2,501.55 in 1982, at various branches of Union Commerce Bank. Peggy Florcosky (hereinafter sometimes referred to as Florcosky) worked for Union Commerce Bank in 1981 and 1982. Although petitioner went to other tellers to perform bank transactions, petitioner went only to Florcosky when he wanted to cash checks payable to Corrigan Ice. [7]
*46 The amount of cash resulting from the cashing of Corrigan Ice checks by these three people is shown in table 2. Table 2 Check Casher
1981
1982
Dvornicky
$  41,815.48
$ 36,637.42
Caroballo
18,739.10
49,796.64
Florcosky
68,296.63
2,501.55
Totals
128,851.21
88,935.61
On or shortly before October 12, 1982, petitioner used several checks payable to Corrigan Ice to pay a plumber for work on petitioner's residence in Medina. At least two of these checks were not included in Sy's' gross receipts or reported as income by petitioner. In 1981 and 1982 petitioner paid many personal expenses from Sy's' checking account. The check stubs for Sy's' checking account were given to Dempsey for Dempsey's use in preparing the tax returns. He returned the check stubs, with a request that petitioner indicate which checks were for Sy's' business and which were for petitioner's personal benefit. Petitioner, or someone acting for him, marked the stubs with "P" or "Personal", to indicate which checks were for petitioner's personal benefit. On July 22, 1982, petitioner bought a 1981 Ford van (hereinafter sometimes referred to as the Ford van) for $ 11,500. The Ford van was paid *47 for with a cashier's check (in the amount of $ 11,500) on which was stated "Remittance by Corrigan". The cashier's check was bought with cash. The certificate of title for the Ford van shows a purchase price of only $ 5,500 and an Ohio sales tax of $ 302.50. Even though the Ford van actually cost $ 11,500, petitioner's only sales tax payment in connection with this purchase was the $ 302.50 shown on the certificate of title. The Ford van was titled in petitioner's name, not in the name of Sy's or Corrigan Ice. The Corrigan Ice logo is on the side of the Ford van, and a refrigeration unit is on top of it. The Ford van was used in the Corrigan Ice business to deliver ice. The Ford van was not used for personal purposes. Neither petitioner nor Sy's claimed an investment credit or a depreciation deduction for 1982 on account of the Ford van. On its 1981 tax return, Sy's shows investment credit in the amount of $ 3,336 and depreciation on transportation equipment in the amount of $ 1,201. On its 1982 tax return, Sy's shows investment credit in the amount of $ 396 and depreciation on transportation equipment in the amount of $ 861. In October 1981 petitioner bought a house in *48 Medina, Ohio (hereinafter sometimes referred to as the Medina house), and moved into it, with Pawlak and his two youngest children, in January 1982. In 1982, the billing and bank deposits for Corrigan Ice were made from the Medina house, but the other operations of Corrigan Ice (including paying the truck drivers) continued to be based at the Bridge Avenue house. The Medina house and associated property cost petitioner $ 269,000. On October 19, 1981, petitioner paid $ 50,000 in cash as a downpayment. On December 31, 1981, and December 31, 1982, the balances petitioner owed were $ 219,000 and $ 204,898.60, respectively. Two of petitioner's sons, Daniel and Shawn (who became 23 and 17, respectively, in 1981), worked for Corrigan Ice at times during the years in issue. Daniel was a full-time student at Dyke College during 1981 and the first half of 1982, and he also worked part time for Corrigan Ice. Daniel drove a truck, made deliveries, answered telephones, sold ice at the ice plant, and supervised employees. Until mid-1982, Daniel was not paid for his work. Daniel used cash from the box on the desk at the Bridge Avenue house to buy gas for his personal automobile. In 1982 *49 Daniel and Shawn lived in the Bridge Avenue house after the rest of the family moved to the Medina house. Corrigan Ice paid for the utilities at the Bridge Avenue house and for Daniel's and Shawn's food. In 1981 and 1982 Shawn was a full-time student at Westside Institute where he was studying refrigeration maintenance. Shawn also worked at Corrigan Ice in the summer months, and was not paid for his work. In 1981, Laurie (petitioner's oldest child, who became 28 in 1981) did some office work for Corrigan Ice on weekends. She was a student at Baldwin-Wallace at that time. She was not paid for her work. Sy's paid tuition and other education expenses for Laurie, Daniel, and Shawn as shown in table 3. Table 3 Child
1981
1982
Laurie
$   852.35
--
Daniel
2,480.00
$ 680
Shawn
3,000.00
n1
Totals
6,332.35
680
The record does not indicate how
Shawn's 1982 tuition was paid.
In 1978 petitioner sold stock for $ 44,043. His basis in this stock was $ 22,753. He acquired this stock in 1973. He reported this transaction on his 1978 tax return. The resulting long-term capital gain increased his adjusted gross income by $ 10,645. In 1980 petitioner sold five different *50 stocks for an aggregate of $ 10,163. His aggregate basis in these stocks was $ 17,640. He acquired these stocks during the period 1968 through 1973. He reported these transactions on his 1980 tax return. The resulting net 1980 long-term loss reduced his 1980 adjusted gross and taxable incomes by $ 3,000 and reduced his 1981 adjusted gross and taxable incomes by $ 738. Petitioner did not have revenue from the sale of silver coins during 1981 and 1982. Throughout 1981 and 1982, petitioner owned stock in Medical Data Systems with a cost basis of $ 13,653, and stock in Sy's with a cost basis of $ 12,898. Throughout 1981 and 1982, petitioner owned unimproved real estate in Florida with a cost basis of $ 2,700. On January 3, 1983, petitioner opened a money market account in his and Daniel's names at Union Commerce Bank with a currency deposit of $ 55,000. Fischbach, see supra note 7, opened the money market account for petitioner. On the same day, Union Commerce Bank filed a Currency Transaction Report with the Internal Revenue Service, which reported this currency deposit. The transactions in this account, all in 1983, are shown in table 4. Table 4 Date
Deposit
Withdrawal
Interest
Balance
1/03
$ 55,000
--
-- $ 55,000.00
currency
1/26
-- --
$ 415.88
55,415.88
2/25
-- --
432.06
55,847.94
3/07
-- $ 10,000 check to
-- 45,847.94
Corrigan Ice
3/16
3,000
--
-- 48,847.94
4/01
-- --
380.38
49,228.32
4/08
-- 6,100 check to
-- 43,128.32
Corrigan Ice
4/26
-- --
245.74
43,374.06
5/06
-- 3,374.06 check to
-- 40,000.00
Corrigan Ice
5/26
-- --
267.44
40,267.44
6/24
-- --
254.84
40,522.28
7/26
-- --
288.91
40,811.19
7/29
-- --
45.81
40,857.00
7/29
-- 10,000 check to
-- 30,857.00
Broadview Savings
& Loan [1]
8/18 [2]
-- 30,857 check to
-- -0- petitioner
8/18
-- --
144.18
144.18
*51 The $ 30,857 check was cashed at the Union Commerce Bank on the same day the check was drawn, and the Union Commerce Bank filed a Currency Transaction Report the same day to report this withdrawal. This account was closed on August 22, 1983. In 1983 Thomas L. Himes (hereinafter sometimes referred to as Himes), a special agent for the Criminal Investigation Division of the Internal Revenue Service, began an investigation of Sy's' and petitioner's income taxes. Himes conducted an initial interview with petitioner on August 8, 1983. This was the first that petitioner knew of the investigation. When Himes asked petitioner how much cash on hand he had, petitioner told Himes that during the years in issue he generally had $ 200 to $ 300 on his person, and generally had $ 2,000 to $ 3,000 in the Bridge Avenue house for payment of business expenses. Petitioner told Himes that before 1983 Corrigan Ice's only employees were petitioner and Daniel and that Daniel went on the payroll in mid-1982. On June 13, 1988, an information was filed in the U.S. District Court for the Northern District of Ohio, Eastern Division, charging petitioner with criminal tax fraud on account of his own 1981 *52 and 1982 income tax returns, sec. 7201, and with aiding and assisting in the preparation and filing of false and fraudulent income tax returns for Sy's for 1981 and for 1982, sec. 7206(2). On June 28, 1988, petitioner pleaded guilty to one of the four counts -- aiding and assisting in the preparation and filing of a false and fraudulent income tax return for Sy's for 1981. On November 29, 1988, petitioner was found guilty of that one count, the three other counts of the information were dismissed, and punishment was imposed as follows: (1) Custody for 3 years, with the first 30 days in jail and the remainder on probation, and (2) a fine of $ 5,000. Petitioner's 1981 and 1982 tax returns were filed early. Petitioner filed a Form 1040X for 1982 on or after April 8, 1983, on which he reported, as omitted from his original 1982 tax return, a $ 1,000 prize won in a raffle. (The amounts for 1982 shown infra in tables 5 and 6 include the $ 1,000 income item and the resulting $ 280 additional tax liability.) On his tax returns for the indicated years, petitioner reported the adjusted gross incomes, taxable incomes, and tax liabilities shown in table 5. Table 5 Adjusted Gross
Taxable
Tax
Year
Income
Income Liability
1974
[1]
$ 5,393
[1]
1975
[1]
6,396
[1]
1976
[1]
7,917
[1]
1977
[1]
9,438
[1]
1978
$ 29,469
25,719
$ 2,025
1980
14,716
9,716
1,252
1981
22,878
18,878
3,473
1982
58,872
32,749
7,030
*53 On his tax returns for the indicated years, petitioner reported income from the sources and in the amounts shown in table 6. Table 6 Source
1978
1980
1981
1982
Wages, etc.
$ 14,000
$ 14,000 $ 20,000 $ 48,500
Interest
191
162 202 248
Dividends [1]
201
290 250 2,500
Net rents
4,532
3,364 3,364 6,724
Capital gains
10,645
(3,000)
(738)
-- and (losses)
Other
-- -- -- 1,000
All of petitioner's reported wages, etc., income during 1980, 1981, and 1982 came from Sy's. (The 1978 Form W-2 is not attached to the tax return copy that is in the record, so we do not make a finding of fact as to this issue for 1978.) On its tax returns for 1981 and 1982, Sy's reported no interest income. Respondent mailed the notice of deficiency to petitioner on March 7, 1989, more than 3 years after petitioner's income tax returns for the years in issue were filed. There was no change in petitioner's cash on hand, including his coin collection, from January 1, 1981, to December 31, 1981, to December 31, 1982. Petitioner's living expenses for the BLS *54 items (described for 1982 infra at table 9 and associated text) were not less than the amounts determined by respondent. Laurie, Daniel, and Shawn did some work for Corrigan Ice during 1981, and Daniel and Shawn did so during 1982. Daniel was paid for his work beginning in mid-1982; apart from that, Laurie, Daniel, and Shawn were not paid for the work they did for Corrigan Ice in the years in issue. Any payment by Sy's of tuition or other expenses of Laurie, Daniel, or Shawn is income to petitioner. Sy's' 1982 payment of $ 4,085.50 for insurance for petitioner and Daniel, and the three 1981 payments (aggregating $ 4,345.82) to New York Life Insurance Co., are payments of petitioner's personal expenses. For each of the years 1981 and 1982, petitioner had an underpayment of income tax required to be shown on his tax return; some part of the underpayment for each year was due to petitioner's fraud. OPINION I. Statute of Limitations
Petitioner has properly raised in his petition the affirmative defense of the statute of limitations under section 6501(a). Rule 39. [8]
*55 In general, section 6501[9] bars assessment of an income tax deficiency more than 3 years after the later of (1) the date the tax return was filed or (2) the due date of the tax return. If the taxpayer proves that the notice of deficiency was mailed more than 3 years after the later of the filing or the due date, then respondent has the burden of pleading and proving the existence of an exception to the general period of limitations. Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069 (1928); see Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); see also Minahan v. Commissioner, 88 T.C. 492, 506 (1987). *56 In the instant case, we have found that petitioner's tax returns for 1981 and 1982 were filed more than 3 years before the notice of deficiency was mailed. Respondent concedes as much. Respondent contends that the instant case falls within the exception to the general period of limitations set forth in section 6501(c)(1), [10] which provides that if a false or fraudulent return is filed with the intent to evade tax, then the tax may be assessed at any time. [11]
*57 We agree with respondent. Respondent has the burden of proving the applicability of the fraud exception to the general period of limitations. Farmers Feed Co. v. Commissioner, supra. This burden is the same as that which respondent bears under section 6653(b). Asphalt Industries, Inc. v. Commissioner, 384 F.2d 229, 232 (3d Cir. 1967), revg. on other grounds 46 T.C. 622 (1966); Botwinik Brothers of Mass., Inc. v. Commissioner, 39 T.C. 988, 996 (1963). To carry this burden for a year, respondent must prove two elements: (1) That petitioner has an underpayment of tax for that year, and (2) that some part of that underpayment is due to fraud. Sec. 7454(a); [12]Rule 142(b); e.g., Carter v. Campbell, 264 F.2d 930, 936 (5th Cir. 1959); Stone v. Commissioner, 56 T.C. 213, 220 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105, 114 (1969). Each of these elements must be proven by clear and convincing evidence. DiLeo v. Commissioner, 96 T.C. 858, 873 (1991), *58 affd. 959 F.2d 16 (2d Cir. 1992); Parks v. Commissioner, 94 T.C. 654, 663-664 (1990); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). For this purpose, respondent need not prove the precise amount of the underpayment resulting from fraud (compare, infra, discussion of the addition to tax under section 6653(b)(2) for 1982), but only that there is some underpayment and that some part of it is attributable to fraud. E.g., Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. *59 In carrying her burden, respondent may not rely on petitioner's failure to meet his burden of proving error in respondent's determinations as to the deficiencies. E.g., Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989); Habersham-Bey v. Commissioner, 78 T.C. 304, 312 (1982), and cases there cited. Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Drieborg v. Commissioner, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated February 24, 1954; Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). A mere understatement of income does not establish fraud. However, a pattern of consistent underreporting of income for a number of years is strong evidence of fraud. Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-144 and 1970-37; Otsuki v. Commissioner, 53 T.C. at 108. *60 The issue of fraud poses a factual question which is to be decided on an examination of all the evidence in the record. Plunkett v. Commissioner, 465 F.2d at 303; Mensik v. Commissioner, 328 F.2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962); Stone v. Commissioner, 56 T.C. at 224. In order to establish fraud, respondent must show that petitioner intended to evade taxes, which petitioner knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of the taxes. E.g., Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Danenberg v. Commissioner, 73 T.C. 370, 393 (1979); Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977); McGee v. Commissioner, 61 T.C. 249, 256-257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). This intent *61 may be inferred from circumstantial evidence ( Powell v. Granquist, 252 F.2d at 61; Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Beaver v. Commissioner, 55 T.C. 85, 92-93 (1970)), including the implausibility of the taxpayer's explanations. Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court dated March 14, 1951. Viewing the record as a whole, we conclude (and we have found) that respondent has proven by clear and convincing evidence that for each of the years 1981 and 1982 petitioner had an underpayment of tax, and that part of the underpayment of tax was due to fraud. A. Underpayment of Tax
Respondent used the net worth method to determine petitioner's income for the years in issue. Under the net worth method, respondent determines a taxpayer's increase in net worth (excess of (1) assets at cost over (2) liabilities) by subtracting (a) the taxpayer's net worth at the beginning of a year from (b) the taxpayer's *62 net worth at the end of the year. To this increase, respondent (1) adds the taxpayer's nondeductible expenditures, including living expenses, and (2) subtracts gifts, inheritances, loans, etc. This method has been approved by the courts. E.g., Holland v. United States, 348 U.S. 121, 125, 99 L. Ed. 150, 75 S. Ct. 127 (1954); United States v. Giacalone, 574 F.2d 328, 330-331 (6th Cir. 1978). Where appropriate, adjustments are then made to the resulting amounts, in order to reach taxable income. In the instant case, for example, the parties have agreed as to dependency exemption deductions in arriving at taxable income. The parties have agreed as to most of the elements involved in the calculations, but disagree as to the following elements: (1) How much cash on hand petitioner had at the beginning and end of 1981 and 1982 and, in this connection, whether he had a coin collection at the beginning of 1981 which he sold off during 1981 and 1982, see infra table 7;
(2) what petitioner's and his household's living expenses were during 1981 and 1982, see infra table 12; and (3) whether a van that was bought in 1982 was an asset of petitioner *63 or an asset of Sy's. Cash on Hand; Coin Collection
The parties' positions as to cash on hand are as shown in table 7. Table 7 Date
Petitioner
Respondent
Jan. 1, 1981
Cash on hand
$ 50,000
$ 300
Coin collection
15,000
-0-
Dec. 31, 1981
31,000
300
Dec. 31, 1982
[1] -0- 55,300
Petitioner paints a picture of a man who carefully saved the proceeds of his 1978 reported stock sale ($ 44,043) and his 1980 stock sales ($ 10,163) and perhaps kept these proceeds under his bed. [13] Under petitioner's scenario, he carefully kept his currency separate from Corrigan Ice's currency, at least after the 1978 sale; he carefully avoided earning interest or making investments with his tens of thousands of dollars in 1981 and 1982 (although he says that he was alert enough to rising silver prices to make profitable sales (unreported on his tax returns) of a substantial coin collection); in 2 years he dissipated his January 1, 1982, $ 50,000 currency hoard, plus his $ 15,000 in coins, notwithstanding sharp increases in his wages, *64 etc., and dividend income from Sy's. See supra table 6. *65 Respondent, too, would have us believe that petitioner carefully separated his currency from Corrigan Ice's currency. However, respondent would have us believe that about 99 1/2 percent of the proceeds of the 1978 and 1980 reported stock sales were dissipated before January 1, 1981; that petitioner had almost no currency to call his own from before January 1, 1981, until some time in 1982; and that between then and the end of 1982, petitioner built his currency hoard from $ 300 up to $ 55,300. Cash hoard contentions are not unusual in cases before this Court, and from time to time those contentions can be persuasive. See, e.g., Goddard v. Commissioner, T.C. Memo. 1962-83. What is unusual about the instant case is that both sides contend that there was a cash hoard -- petitioner that there was a cash hoard at the start to vastly reduce the amount of the net worth increase each year; and respondent that there was a cash hoard at the end, to vastly raise the amount of the net worth increase for 1982. We disagree with each side's views, both as to cash hoard and as to petitioner's care in separating his currency from Corrigan Ice's currency. First *66 we consider the coin sales claim. Petitioner claims that, on January 1, 1981, he had coins which had cost him about $ 15,000. At trial he testified that he had accumulated silver coins (from the Franklin Mint) and U.S. mint coins over a period beginning in the mid-1950s, and that he sold portions of his collection in 1980, 1981, and 1982 to take his profits in light of the high prices then being offered for silver. Apart from petitioner's conclusory testimony, the record does not include evidence supporting these claims. In particular, none of petitioner's tax returns for any of the 3 years of the asserted sales shows any receipts from such sales. Also, petitioner has not given us any information as to how much he received as a result of these asserted sales. Of course, if he had provided such information, a further question would arise as to why petitioner omitted to report on his tax returns the profits from these asserted sales. We are satisfied that, if petitioner had a substantial coin collection on hand on January 1, 1981, then he still had it on December 31, 1982, and so (1) there would be no change in his net worth on account of the coin collection and (2) the coin *67 collection would not be a nontaxable source of funds to pay for petitioner's expenditures. [14] We have found that petitioner did not have revenue from the sale of silver coins during 1981 and 1982. *68 Next we consider the cash, or currency, on hand. The picture that emerges from the record in the instant case is that petitioner kept substantial amounts of cash at the Bridge Avenue house. This cash supply was frequently replenished by (1) Corrigan Ice customers' cash payments (perhaps 40-50 percent of the Corrigan Ice receipts) and (2) petitioner's cashing of checks made payable to Corrigan Ice. The check cashing shown in the record produced more than $ 215,000 cash during the 2 years in issue. See supra table 2. This cash supply was used to pay certain business expenses and also was dipped into in order to pay personal expenses of petitioner and his household. From time to time capital expenditures were made in cash. For example, the parties have stipulated that on October 19, 1981, petitioner paid $ 50,000 in currency as a downpayment on the Medina house. Also, the parties have stipulated that the $ 11,500 cashier's check used to buy the Ford van on July 22, 1982, was paid for by currency. Also, the parties have stipulated that on January 3, 1983, petitioner used $ 55,000 in currency to open a money market account in Union Commerce Bank. Finally, about $ 35,000 *69 cash was deposited into Sy's' bank account. Both sides focus on the money market account, which appears to be the basis for respondent's determination that petitioner had $ 55,300 cash on hand on December 31, 1982. We do not believe it to be appropriate to treat the $ 55,000 as petitioner's cash on hand as of December 31, 1982. Although petitioner acknowledges that he had the currency on hand as of December 31, 1982, the real question is whether it was his money, rather than belonging to Sy's. As we have noted, more than $ 215,000 of Sy's' funds went through petitioner's hands in cash in 1981 and 1982 just on account of the cooperation of Dvornicky, Caroballo, and Florcosky. In addition some cash came from those Corrigan Ice customers that paid in cash. Even under respondent's determinations, the major portion of this appears to have been used for Corrigan Ice. Also, we note that the first three withdrawals from the money market account, aggregating $ 19,474.06, were in the form of checks to Corrigan Ice, and were withdrawn before petitioner knew about respondent's tax examination. See supra table 4. On the basis of the record in the instant case, we conclude that it is *70 more likely than not that, as of December 31, 1982, the $ 55,000 had not yet been appropriated by petitioner as his own. Cf. United States v. Thetford, 676 F.2d 170, 175 (5th Cir. 1982). Accordingly, we conclude, and we have found, that there was no change in petitioner's cash on hand from January 1, 1981, to December 31, 1981, or from the latter date to December 31, 1982. Under these circumstances, it is not necessary for us to determine whether the amount on all three dates was $ 300, or $ 31,000, or $ 55,000, or any other specific amount. See supra note 14. As we calculated it, as a result of the parties' stipulations and our determinations as to cash on hand and coin collection, even if we were to hold for petitioner on all the other disputed elements (living expenses and the Ford van), we would conclude that petitioner had omitted about $ 30,000 from income for 1981 and more than $ 45,000 from income for 1982. Petitioner does not contend that he is entitled to credits, exclusions, or deductions in addition to those claimed on his tax returns (other than those stipulated to by the parties). As a result, inclusion of the above-noted omitted *71 income amounts will result in increased tax liabilities for each of the years in issue. Thus, respondent has proven by clear and convincing evidence, taking into account the parties' stipulations, that petitioner has underpayments of income tax for 1981 and 1982. We so hold, and we have so found. B. Fraud
Dempsey advised petitioner to run all the Corrigan Ice receipts through the Sy's checking account and to pay business expenses, including employee compensation, by check from that account. Dempsey told petitioner that Sy's' tax returns would be based on Sy's' checking account. Petitioner thereupon did the opposite. He intercepted substantial numbers of checks paid by Sy's' customers and cashed the checks, using the proceeds for personal as well as business purposes. He avoided paying employee compensation by check. His use of Sy's' cash was so extensive that it showed up as substantial income omissions under the net worth method. [15] In addition, petitioner used Sy's' checking account to pay some of his personal expenses. When Dempsey suspected that this might be the case, he asked petitioner to identify the Sy's checks that were so used. The check stubs then were *72 returned to Dempsey, with some stubs marked "P". Petitioner's only argument is that respondent has failed to show that petitioner himself placed the "P's" on the check stubs. Petitioner claimed that he was so attuned to investment-related news that, when silver prices rose, generally lifting numismatic values, he took advantage of this temporary market increase by selling coins that had originally cost him about $ 15,000. If petitioner was not telling the truth, then this is additional evidence of fraud, and perhaps perjury. If petitioner was telling the truth, then this is additional evidence of fraud, because petitioner did not report any gains on the alleged sales for any of the years during which, *73 petitioner testified, he was selling these coins at substantial profits. At the same time, petitioner would have us believe that he kept substantially all of the $ 44,043 in proceeds of stock sales from 1978 until January 1, 1981, and that he kept this amount in cash even through a period of high interest rates available in personal bank accounts. We do not believe petitioner's stories about how he came to have a substantial cash hoard on January 1, 1981, a cash hoard whose presence would explain much of Petitioner's acquisitions and expenditures during 1981 and 1982. Petitioner's story about his cash hoard becomes additional evidence of his fraud. In attempting to explain why he cashed Corrigan Ice checks, rather than depositing them, petitioner testified that the ice business was seasonal, and was very slow during the winter months. Petitioner testified that he kept money from the summer months at the Bridge Avenue house so that he could pay expenses in the winter months. Petitioner testified that if the money were put in the bank, then it would be spent and would not be available to pay bills during the winter. We do not believe petitioner's story about this seasonal need *74 to keep money in cash rather than accessible bank accounts. We note that petitioner did not indicate that this seasonal phenomenon operated differently on January 1, 1981, December 31, 1981, and December 31, 1982. Thus, this story appears to contradict petitioner's contention that his cash-plus-coins hoard was $ 65,000 on January 1, 1981, $ 31,000 on December 31, 1981, and apparently nothing on December 31, 1982. See supra table 7. This seasonal cash hoard story becomes additional evidence of petitioner's fraud. We conclude that petitioner's statements are not credible. Petitioner's implausible and inconsistent explanations of his behavior are an indication of fraud. Boyett v. Commissioner, 204 F.2d at 208; see Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), and cases collected therein at item (4), affg. T.C. Memo. 1984-601. We conclude, and we have found, that respondent has proven by clear and convincing evidence that petitioner had unreported taxable income in each of the years in issue, and that petitioner underpaid his tax liability in each year. We also conclude, *75 and we have found, that petitioner's intent to evade taxes has been proven by clear and convincing evidence. Based on respondent's showing of petitioner's failure to report substantial amounts of income in both of the years in issue, petitioner's incredible and inconsistent statements at trial, petitioner's check-cashing schemes and diversion of corporate income for his personal use, and petitioner's inadequate records, we find that respondent has established by clear and convincing evidence that in each of the years in issue petitioner filed a fraudulent income tax return with the intent to evade a tax which he believed to be owing. We conclude that the statute of limitations does not bar assessment and collection for either 1981 or 1982. We hold for respondent on this issue. II. Fraud Additions to Tax
A. Fifty-Percent Addition
We have held that the statute of limitations does not bar assessment of any deficiency or additions to tax for 1981 and 1982. In order to impose the 50-percent fraud addition to tax on petitioner for 1981 (sec. 6653(b)[16]) or 1982 (sec. 6653(b)(1)), respondent must prove, by clear and convincing evidence, that petitioner has an underpayment *76 of tax for that year, and that some part of that underpayment is due to fraud. Our conclusion as to the statute of limitations issue results in our concluding that respondent has carried her burden of proof as to the 50-percent addition to tax for both years. *77 We hold for respondent on this issue. B. Additional Amount for Portion Attributable to Fraud
The additional amount added to the tax under section 6653(b)(2) (equal to 50 percent of the interest payable under section 6601) applies only to the portion of the underpayment which is attributable to fraud. In the notice of deficiency respondent determined that this additional amount applied to the entire 1982 deficiency -- $ 62,160. Respondent has the burden of proving what portion of the deficiency is attributable to fraud. Sec. 7454(a); Rule 142(b). [17]
*78 In Part IA of this opinion we considered the parties' disputes as to the amounts of petitioner's income in order to determine whether respondent proved by clear and convincing evidence that petitioner had an underpayment of tax. After examining the parties' cash on hand contentions, we concluded that respondent carried this burden of proof as to the January 1, 1981, and December 31, 1981, amounts, but not the December 31, 1982, amount. These conclusions as to the cash on hand contentions apply also to our consideration of the additional addition to tax under section 6653(b)(2) for 1982. We proceed to consider the other disputed items for 1982, as follows: (1) BLS items, (2) house operations, (3) other family consumption, (4) other items, and (5) a Ford van. Both sides have made concessions. The parties' aggregate positions are as shown in table 8. Table 8 Category
Respondent
Petitioner
BLS items
$ 15,254.24
$  8,700.00
House operations
4,611.92
3,920.37
Other family consumption
5,339.50
4,401.81
Other items
15,577.85
11,342.35
Agreed other personal
living expenses
34,127.46
34,127.46
Total personal living
expenses
74,910.97
62,491.99
Ford van
11,500.00
-0- Totals
86,410.97
62,491.99
*79 (1) BLS Items
The parties' positions as to the BLS items are as shown in table 9. Table 9 Item
Respondent
Petitioner
Groceries and outside meals
$  7,738.26
$ 4,000
Auto expense
3,015.23
2,000
Clothing
1,896.94
1,000
Personal care
810.41
500
Medical care
1,793.40
1,200
Totals
15,254.24
8,700
For 1982, petitioner's household included himself, Pawlak, Daniel (who turned 24), Shawn (who turned 18), Brian (who turned 14), and Patricia (who turned 12). The parties have stipulated as follows with regard to respondent's determinations, as shown in table 9: 42. For the years 1982, respondent computed the following personal living expenses of petitioner using the Bureau of Labor Statistics for a family of 5 (Husband, wife and 3 children with the oldest child 18 years old or older) with an intermediate budget living in Cleveland, Ohio:
In 1982, petitioner, Pawlak, Brian, and Patricia lived in the Medina house, while Daniel and Shawn continued to live in the Bridge Avenue house. Medina County adjoins Cuyahoga County (in which Cleveland is located) to the southwest. The city of Medina is about 20 miles from Cleveland. Neither side suggests that in *80 1982 the expense categories in table 9 were appreciably different in Medina County from what they were in Cleveland. Accordingly, we treat the expenses as being the same. Petitioner concedes personal living expenses aggregating $ 62,491.99 in 1982. See supra table 8. This tends to support the idea that petitioner and his household did not live frugally. We do not suggest that they were spendthrifts, but an intermediate budget level clearly is not too high a starting point for analysis of this issue. Daniel did not go on Sy's' payroll until mid-1982. Before that time, his support came from petitioner. Even after mid-1982, he continued to live in the Bridge Avenue house. Thus, petitioner's household personal living expenses for the first half of 1982 were for a household of six people. This tends to support the proposition that petitioner's expenses were not less than the amounts in the BLS statistics for five-people households. During 1982, petitioner owned a 1974 Cadillac and a 1975 Cadillac. (The 1981 Ford van, which he bought in 1982, appears to have been used entirely for business purposes. We consider the van separately infra; we do not take it into account *81 for purposes of the BLS Items auto expense.) Petitioner acknowledged that his move to the Medina house significantly increased his automobile expenses. As we have noted, the city of Medina is about 20 miles from Cleveland. In 1981, petitioner gave his 1972 Cadillac to Daniel. Daniel testified that he took money for gasoline and other automobile expenses from the cash at the Bridge Avenue house. We believe this pattern continued at least until Daniel went on Sy's' payroll, in mid-1982. This tends to support the proposition that petitioner's auto expenses were not less than the amount in the BLS statistics for that expense category. The only contrary evidence is petitioner's "estimates". Petitioner gave almost no explanation of how he arrived at his numbers. The scant explanations he gave for some items were unpersuasive. We conclude, and we have found, that respondent has shown by clear and convincing evidence that petitioner's 1982 expenditures for the BLS items were not less than the amounts that the BLS statistics show; i.e., the amounts in the middle column of table 9. We hold for respondent on this issue. (2) House Operations
The only disputed house operations *82 item for 1982 is Sy's' check no. 4376 to Weaver Oil in the amount of $ 691.55. Petitioner testified as follows: BY MR. LYNCH: Q Mr. Corrigan, in the stipulation of facts the parties have agreed on the Exhibit marked 25Y. And that Exhibit shows, its from check number 4736, the amount of $ 691.55 and it apparently was made out to Weaver Oil on January 15th, 1982. Do you know what that was -- Can you tell what that was for? A [Petitioner] I'm not sure; Weaver Oil, we did business with Weaver Oil on Bridge Avenue and we also did business with Weaver Oil for the house in Medina. What year was that? Q 1982; January 15th, 1982. A I'm not positive what that is; I'm not sure because we did business for Weaver Oil for both places and I thought that was a business expense at the time, but I'm not sure. Q The Respondent has called that a personal expense? A Uh-huh. Q Are you saying you don't know? A No, I'm not -- I couldn't say positively, it could either be for expense at the house in Medina or it could be for the business down on Bridge, I'm not sure. Q All right. Thank you.
If the expense was for the Medina house, then it clearly was personal. On the other hand, if the *83 expense was for the Bridge Avenue house or the related ice houses, then the matter is unclear. The ice house and the concrete ice building are entirely business properties. The Bridge Avenue house is treated as entirely a business property on petitioner's tax returns and respondent does not dispute petitioner's depreciation deductions therefor. On the other hand, petitioner's entire household lived in the Bridge Avenue house in 1981, and Daniel and Shawn lived there in 1982. See secs. 280A(a) and 280A(d)(2)(A). In light of the ambiguity as to (1) the purpose of the payment and (2) the status of the Bridge Avenue house, we conclude that respondent has failed to prove by clear and convincing evidence that the Weaver Oil $ 691.55 payment was a personal expense. We hold for petitioner on this issue. (3) Other Family Consumption
The only disputed other family consumption items for 1982 are the Sy's checks described in table 10. Table 10 Check No.
Date
Payee
Amount
4409
Feb. 26
Dyke College
$ 680.00
4442
Apr. 28
American Express
55.69
4445
May 10
Aetna
92.00
4475
July 1
American Express
35.00
4617
Sept. 15
Director Rosary Hall
75.00
Total
937.69
The *84 $ 680 check to Dyke College was for Daniel's tuition. We have found that Sy's did not pay Daniel for his Corrigan Ice work until mid-1982. We have found that any Sy's payments of Daniel's expenses during the first half of 1982 are payments of expenses of petitioner's household and are income to petitioner. As to the two checks to American Express and the check to Aetna, the evidence is meager and ambiguous. We conclude that respondent has failed to prove by clear and convincing evidence that these items ($ 55.69, $ 92, and $ 35) were personal expenses. The stub of the $ 75 check to Director Rosary Hall shows that it was for five tickets. Petitioner testified that Rosary Hall was a center for alcoholics, in Cleveland. Sy's did not take any charitable contribution deduction on its 1982 tax return. We do not know (1) what the tickets were for, (2) who used the tickets, and (3) whether the $ 75 was included by petitioner in his $ 150 claimed contribution deduction, described as "MISC. CHARITABLE ORGANIZATIONS" on his 1982 tax return. We conclude that respondent has failed to prove by clear and convincing evidence that the Director Rosary Hall $ 75 payment was a personal expense. *85 We hold for respondent as to the $ 680 check; we hold for petitioner as to the remaining four checks, aggregating $ 257.69. (4) Other Items
The only disputed other items for 1982 are (1) Sy's' check no. 4362 to Frank Ritz in the amount of $ 150 and (2) Sy's' check no. 4579 to New York Life in the amount of $ 4,085.50. The stub for the $ 150 check is marked "Personal". The only testimony is that it is a payment for damage caused by a Sy's truck which backed into Ritz' auto. Petitioner testified that he concluded it was better to pay the claim than to turn it over to his insurance company. The stub notation favors respondent; the testimony favors petitioner. We conclude that respondent has failed to prove by clear and convincing evidence that the Frank Ritz $ 150 check was a personal expense. The $ 4,085.50 check was for insurance on petitioner and Daniel. The check is dated August 17, 1982, by which time Daniel had become an employee of Sy's. Sy's' 1982 tax return shows deductions for various kinds of insurance, but not for this. The balance sheet (Schedule L) and attached schedule of Sy's' 1982 tax return does not show any insurance policy asset. We conclude, and *86 we have found, that this insurance premium payment is a payment of petitioner's personal expenses. We hold for respondent as to the $ 4,085.50 check; we hold for petitioner as to the $ 150 check. (5) Ford Van
Petitioner bought the Ford van in 1982 for $ 11,500. The Ford van was used in the Corrigan Ice business and not for personal purposes. As far as we can tell, the Ford van was business property and should have given rise to both a depreciation deduction and an investment credit. Yet neither Sy's nor petitioner claimed the deduction or the credit. Petitioner has not enlightened us as to why this is so. Petitioner chose to have the Ford van titled in his name. He contends that the Ford van belongs to Sy's, not him, but does not explain why the title is in his name, and not Sy's. We conclude that respondent has failed to prove by clear and convincing evidence that the Ford van was an asset of petitioner on December 31, 1982. We hold for petitioner on this issue. (6) Summary
The parties have settled many of the items. See, e.g., supra table 8. Table 11 shows the resolution of only the disputed items to be taken into account in determining the amount *87 of petitioner's 1982 underpayment, sec. 6653(c), that is subject to the additional addition to tax under section 6653(b)(2). Table 11 Respondent's
Petitioner's
Court's
Item
Position
Position
Holding
Increase or (decrease) in
cash on hand
$ 55,000.00
($ 31,000)
-0- BLS items
6,554.24
-0- $  6,554.23
House operations
691.55
-0- -0- Other family consumption
937.69
-0- 680.00
Other items
4,235.50
-0- 4,085.50
Ford van
11,500.00
-0- -0- Totals
78,918.98
(31,000)
11,319.74
III. Amounts of Deficiencies
In Part I of this opinion, respondent had the burden of proving, by clear and convincing evidence, that there was an underpayment, some part of which was due to fraud; respondent carried this burden. In Part IIB of this opinion, respondent had the burden of proving, by clear and convincing evidence, what was the amount of the 1982 underpayment that was due to fraud; respondent carried this burden, but only in part. In this part of the opinion, petitioner has the burden of proving, by a preponderance of the evidence, that respondent erred in her notice of deficiency determinations as to matters of fact. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). *88 We proceed to consider each of the disputed elements that go into the redetermination of petitioner's deficiencies. A. Cash on Hand; Coin Collection
For reasons described in Part IA of this opinion, we conclude that there was no change in petitioner's cash on hand or his coin collection. Thus, petitioner is not entitled to reduce his omitted income by $ 34,000 for 1981 and $ 31,000 for 1982 on account of this item. Also, respondent is not entitled to increase petitioner's omitted income by $ 55,000 for 1982 on account of this item. See supra table 7. B. Personal Living Expenses
In the notice of deficiency, respondent determined that petitioner and his household had 12 categories of personal living expenses that should be added to petitioner's increases in net worth, in calculating the amount of petitioner's increases in taxable income. Both sides have made concessions. The parties' aggregate positions are as shown in table 12. Table 12 1981
1982
Respondent -- notice of deficiency
$ 69,610.99
$ 75,984.57
Respondent -- after concessions
68,148.54
74,910.97
Petitioner
[1] 38,643.86
62,491.99
Remaining in dispute
29,504.68
12,418.98
*89 The parties' disputes are as to (1) the five BLS items, (2) house operations, (3) other family consumption, and (4) other items. We consider these matters seriatim. (1) BLS Items
We considered this matter as to 1982 in Part IIB(1) of this opinion. Our analysis as to 1982 applies with essentially the same force as to 1981. (It is diminished as to 1981 by removal of petitioner's need to commute from the Medina house to the Bridge Avenue house. It is enhanced as to 1981 by Daniel's being supported by petitioner during all of 1981, while for the second half of 1982 Daniel had his own salary as a source for his expenses.) Accordingly we hold for respondent on this issue. (2) House Operations
The 1982 item, Sy's' $ 691.55 check to Weaver Oil, is discussed in Part IIB(2) of this opinion. The ambiguity that led us to hold against respondent in that part of this opinion, leads us to hold against petitioner in the instant part. Petitioner has failed to carry his burden of proof. For 1981, respondent determined that petitioner spent $ 2,077.12 on the "House Operations" component of personal living expenses. Petitioner concedes $ 689.37 of this amount. The remaining *90 $ 1,387.75 is in dispute and is evidenced by seven of Sy's' check stubs. Each of the check stubs was marked "P" or "Personal", either by petitioner or someone on his behalf in response to Dempsey's request for information. As to six of the seven checks, petitioner's testimony was vague, giving almost as much support to respondent's position as to petitioner's. His entire testimony as to the remaining check is as follows: Exhibit 22V again, check number 4317, for $ 1,075, Superior Products, is for office furniture.
It developed that petitioner had taken with him to the witness box a marked-up copy of the exhibit. Next to the check number on that copy of the exhibit someone had penciled the notation, "Superior Products Office Furniture". The record does not include any other evidence describing what was being paid for and what use was made of what was being paid for. We conclude that petitioner has failed to carry his burden of proving error in respondent's determinations as to any of the house operations items for 1981 or 1982. We hold for respondent on this issue. (3) Other Family Consumption
We considered this matter as to 1982 in Part IIB(3) of this opinion. *91 The $ 680 check for Daniel's tuition is a personal expense. The ambiguity as to the four other checks (aggregating $ 257.69) that led us to hold against respondent in that part of this opinion leads us to hold against petitioner, on the burden of proof, in the instant part. For 1981, there are 32 disputed Sy's checks, aggregating $ 15,501.10. Each of the check stubs is marked "P" or "Personal"; this was done either by petitioner or by someone on his behalf, in response to Dempsey's request for information. Sixteen of these Sy's checks, aggregating $ 6,332.35, are for education of three of petitioner's children (four checks aggregating $ 852.35 for Laurie, petitioner's oldest daughter; five checks aggregating $ 2,480 for Daniel; seven checks aggregating $ 3,000 for Shawn). Petitioner contends that his sons and his daughter were employees of Corrigan Ice during the years in issue, and that any amounts paid for his children's personal expenses (such as their college tuition) was really compensation from Corrigan Ice for work, and not a personal expenditure of petitioner. Sy's did not deduct any employee salary and wages on its 1981 tax return. There is no indication that Sy's *92 sent a Form W-2 or Form 1099 to any of petitioner's children. Sy's did not withhold any amounts as taxes from the alleged compensation, even though petitioner knew that certain amounts, such as F.I.C.A. taxes, should be withheld from wages. There is no evidence that the education payments for any of petitioner's children bore any relationship to the services that child performed for Corrigan Ice or any other Sy's activity. We conclude that all 16 of the education expense checks were to pay petitioner's personal expenses. Six of these Sy's checks, aggregating $ 8,156.18, are checks to American Express. Petitioner described these checks as payments for expenses in connection with annual conventions of the Packaged Ice Association and annual conventions of the Great Lakes Ice Association. The underlying receipts indicate that the bulk of these expenses were charges for airline tickets, hotels, and car rentals involving travel to places such as Las Vegas, Los Angeles, and Mexico. Petitioner contends that many of these underlying charges were in connection with business conventions that he and Pawlak attended. However, the only evidence in the record to support this contention *93 is petitioner's testimony. Among the charges are four, totaling $ 1,536.48, to pay for airline tickets and hotel expenses for two Las Vegas trips for the Mulgrews, friends of petitioner. Petitioner also went on those trips. Petitioner testified that the Mulgrews reimbursed him for these charges. But the charges were paid by Sy's, and there is no evidence (not even petitioner's conclusory testimony) that any such reimbursement made its way back to Sy's' bank account. Also, there is no persuasive evidence that petitioner's expenses were properly business expenses of Sy's or of petitioner. Petitioner admitted at trial that two payments by Sy's, in the amounts of $ 2,725.72 and $ 548.07, included charges for a trip to Mexico after an asserted Packaged Ice Association convention. When asked about the business nature of the Mexico trip, petitioner responded "Well, it was done through the convention office." Petitioner also testified that another payment to American Express, in the amount of $ 2,370.46, was for charges made by Pawlak, for which she later reimbursed Sy's "through her inheritance". [18] However, no documentation or other evidence was produced to support this testimony. *94 Petitioner's testimony about these expenses is vague, and petitioner does not even attempt to explain how certain of the underlying expenses (such as a charge to a jewelry company, and airline tickets for Daniel and for one Mary Pat O'Brien) relate to Sy's' business. Sy's deducted only $ 1,078 of convention expenses on its 1981 tax return. There is no evidence in the record, and petitioner does not contend, that Sy's deducted any of the charged American Express items that Sy's paid for. Petitioner has not carried his burden of proving that these expenses were expenses of Sy's, rather than of petitioner. These check stubs all carried the notation of "P" or "Personal". We conclude that the payments to American Express were for personal expenses of petitioner. *95 Five of these Sy's checks, aggregating $ 98.45, were to the Cleveland Plain Dealer or the West Side News, assertedly for business advertisements. We note that Sy's deducted $ 1,413 for advertising on its 1981 tax return and $ 621 on its 1982 tax return. Apart from petitioner's brief conclusory statements (generally, "it was for an ad"), there is no way to tell whether the payments were for advertisements (rather than, say, subscriptions) and if the advertisements were for business purposes (rather than, say, for advertisements to sell petitioner's personal property). Two of the remaining Sy's checks, aggregating $ 59.12, were for flowers. There was not any evidence as to who the flowers were for or the specific business, nonpersonal purpose of the flowers. There is a Sy's check in the amount of $ 155 to the Cleveland Browns, assertedly for "an ad in something". This is not enough to carry petitioner's burden of proof. There is a Sy's check in the amount of $ 500 to Olympia Sporting Goods, assertedly "for the broom hockey team that we backed." This conclusory bit of testimony is not enough to carry petitioner's burden of proof. Finally, there is a Sy's check in the amount *96 of $ 200 to the Packaged Ice Association. We would have thought that this item showed promise as a business expense of Sy's. However, the total testimony in respect of this item was as follows: "23W, [the exhibit number] check number 4164 for $ 200 is to the Packaged Ice Association." Petitioner had taken with him to the witness box a marked-up copy of the exhibit. Next to the typed check number and amount, there had been pencilled on the exhibit the words "PACKAGED ICE ASSOCIATION". All that petitioner did was to read this out loud as his testimony. Petitioner did not read for us the largely illegible words that had been written on the check stub. Petitioner did not tell us what Sy's bought for the $ 200. Thus, we do not even have as to this check the conclusory testimony that we held to be inadequate as to the $ 500 check to Olympia Sporting Goods. The check stub is marked "Personal". We conclude that the $ 200 check to Packaged Ice Association was to pay for a personal expense on behalf of petitioner, and not a business expense on behalf of Sy's. We hold for respondent on this issue. (4) Other Items
We considered this matter as to 1982 in Part IIB(4) of this opinion. *97 The $ 4,085.50 check to New York Life is a personal expense. The ambiguity as to the $ 150 check to Frank Ritz that led us to hold against respondent in that part of the opinion leads us to hold against petitioner, on the burden of proof, in the instant part. For 1981, there are 12 disputed Sy's checks, aggregating $ 5,258.84. Each of the check stubs is marked "P" or "Personal"; this was done either by petitioner or by someone on his behalf, in response to Dempsey's request for information. Three of these Sy's checks, aggregating $ 4,345.82, are to New York Life Insurance Co. We conclude that these are personal, for the reasons that led us to the same conclusion as to the 1982 Sy's check to New York Life Insurance Co. Three of the checks, aggregating $ 184.92, are described as tickets for vehicles. We are not given details that would convince us that Sy's, and not petitioner, was liable for these tickets. We conclude that petitioner has failed to carry his burden of proving that these items were not personal. Two of the checks, aggregating $ 77.60, are to St. Stephen's and are described as contributions. On its 1981 tax return, Sy's claimed a charitable contribution deduction *98 of $ 25. There is no indication in the record that Sy's deducted either of these checks. If these checks were charitable contributions, as petitioner claims, then it appears that they were on behalf of petitioner rather than Sy's. It follows that they are income to petitioner. Petitioner did not itemize his personal expense deductions for 1981. Thus, if we credit petitioner's testimony, then he has income in the amount of these checks and he does not have an offsetting deduction. Two of the checks, aggregating $ 60.50, are described as payments for advertisements. On its 1981 tax return, Sy's claimed an advertising expense deduction of $ 1,413. There is no indication in the record, or contention by petitioner, that Sy's deducted either of these checks. This suggests that, if the checks were indeed for advertisements, then it is more likely that they were for petitioner's purposes rather than for Sy's business purposes, and should be included in petitioner's income. One check, for $ 500, is to James Carney, who is described as "the company lawyer." On its 1981 tax return, Sy's claimed a "professional fees" expense deduction of $ 1,470. There is no indication in the record, *99 or contention by petitioner, that Sy's deducted this check. There is no indication in the record that the payment was for an expense (or capital expenditure) of Sy's rather than petitioner. We conclude that petitioner has failed to satisfy his burden of proving that the check was not for petitioner's personal purposes. One check, for $ 90, is described as follows in the transcript: A [Petitioner] * * * 23X, check number 4267 for $ 90 was to John O'Brien spots [sports] equipment for broom hockey team. Q [Lynch] That's the company's? A Yes. That was the team that we backed.
As we stated in dealing with the Sy's check in the amount of $ 500 to Olympia Sporting Goods (discussed supra under Other Family Consumption [19]), this conclusory bit of testimony is not enough to carry petitioner's burden of proof. *100 C. Ford Van
We considered this matter in Part IIB(5) of this opinion. The ambiguity that led us to hold against respondent in that part of this opinion, leads us to hold against petitioner in the instant part. Petitioner has failed to carry his burden of proof. D. Summary
We disagree with both sides on the issue of cash on hand and coin collection. We hold that cash on hand and coin collection amounts were unchanged on all three measuring dates. We hold for respondent as to the other disputed elements of the net worth and expenditures determinations; we have indicated which of the holdings are based on a preponderance of the evidence and which on petitioner's burden of proof. IV. Substantial Understatement of Liability
Respondent determined that petitioner is liable for an addition to tax under section 6661 for 1982. Section 6661 provides for an addition to tax equal to 25 percent of an underpayment which is due to a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $ 5,000. On brief, petitioner does not argue the addition to tax under section 6661(a); we treat this *101 as, in effect, a concession by petitioner that the addition applies if the understatement is substantial according to the statute's requirements. See subpars. (4) and (5) of Rule 151(e); Sundstrand Corp. v. Commissioner, 96 T.C. 226, 344 (1991); Foil v. Commissioner, 92 T.C. 376, 409 (1989), affd. 920 F.2d 1196 (5th Cir. 1990); Money v. Commissioner, 89 T.C. 46, 48 (1987). We conclude that the addition to tax applies if, after the Rule 155 computation, there is substantial understatement. We hold for respondent on this issue. To take account of respondent's concessions and the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless indicated otherwise, all section references are to sections of the Internal Revenue Code of 1954 as in effect for the years in issue.↩
1. The addition is 50 percent of the interest on $ 62,160.↩
2. Petitioner did not claim dependency deductions for Pawlak on his tax returns. The parties have stipulated that Pawlak lived with petitioner throughout the years in issue, and that he is entitled to dependency deductions for her. See subsecs. (a)(9) and (b)(5) of sec. 152. The Bureau of Labor Statistics (hereinafter sometimes referred to as BLS) family expenses statistics that respondent used for the notice of deficiency are stipulated as being "for a family of 5 (husband, wife and 3 children * * *)". Evidently, the parties have regarded Pawlak as the "wife" for these purposes. See sec. 151(b). Also, Pawlak's bank account is taken into account in petitioner's net worth statement. Nevertheless, it appears that respondent has not disturbed petitioner's tax return claim of head of household status. See sec. 2(b)(1) (opening flush language). The parties have not explained to the Court how the elements of the foregoing hang together. We leave the parties as we find them on this point.↩
3. The record and the parties' positions are clear that the Bridge Avenue house was used for business office purposes throughout the years in issue, and that the whole Corrigan household lived there in 1981 and Daniel and Shawn lived there in 1982. Although petitioner claimed -- and was allowed -- depreciation deductions for the Bridge Avenue house on Schedule E, it does not appear that he claimed deductions for real property taxes on the property at that address. Also we are not told what happened to the basis allocable to the land. On this point, also, we leave the parties as we find them.↩
4. So stipulated. However, the stipulated exhibit which summarizes these checks shows only 326 checks. Also, comparing the checks listed on the exhibit with the stipulated amounts, it appears that $ 55.25 of the amount in the stipulated total for 1981 should instead be included in the 1982 total. The parties do not explain these discrepancies.↩
5. So stipulated. However, the stipulated exhibit which summarizes these checks shows only 567 checks. Also, according to the exhibit, the sum of the total amounts for 1981 and 1982 is $ 37.85 less than the sum of the stipulated amounts for 1981 and 1982. The parties do not explain these discrepancies.↩
6. In 1983 Union Commerce Bank became Huntington Bank of Northeast Ohio. For purposes of this opinion, we will refer to this bank only as Union Commerce Bank.↩
7. The parties have stipulated that the checks to Corrigan Ice were cashed at "various" Union Commerce Bank branches. Yet, petitioner's testimony, and the thrust of respondent's questions on this point, are to the effect that Florcosky was the only teller to do this cashing. Michael Fischbach (hereinafter sometimes referred to as Fischbach), a Union Commerce Bank branch manager in 1981 and 1982, testified that the bank's policy at that time was to not cash such checks. Neither side sought to explain why Florcosky cashed the checks in violation of bank policy, and how she got around to "various" branches. Neither side asked Fischbach about Florcosky or her cashing of the checks. This matter is but one of several in the instant case where the parties have opened a line of inquiry but then left it dangling.↩
1. The check has the notation, "Pawlak -- Balloon".↩
2. The stipulated bank statement shows the withdrawal on Aug. 12, but the stipulated check is dated "8/18", and the stipulated Currency Transaction Report (discussed infra) shows the transaction as being on "8-18".↩
1. Information not in the record.↩
1. Petitioner reported dividends from Sy's as follows: 1980 -- $ 250, 1981 -- $ 250, 1982 -- $ 2,500.↩
8. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
9. Sec. 6501 provides, in pertinent part, as follows: SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. -- Except as otherwise provided in this section, the amount of any tax imposed by this title [title 26, the Internal Revenue Code] shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) * * * and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. (b) Time Return Deemed Filed. -- (1) Early return. -- For purposes of this section, a return of tax imposed by this title, * * * filed before the last day prescribed by law or by regulations promulgated pursuant to law for the filing thereof, shall be considered as filed on such last day.↩
10. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. * * * (c) Exceptions. -- (1) False return. -- In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
11. Although respondent does not deal with the statute of limitations, as such, on brief or on opening statement, the fraud exception to the statute of limitations was properly pleaded in the answer, and the Court is satisfied that both sides understood that a holding of fraud would serve double duty -- i.e., that it would (1) prevent the statute of limitations from barring assessment of tax and (2) be the basis for imposition of the civil fraud additions to tax. Thus, we do not treat respondent's silence on brief as an indication that she has conceded this issue. Petitioner, too, does not deal with this matter on brief. However, the procedural setting is such that petitioner had no obligation to do so. Petitioner raised the matter in the petition. In the answer, respondent's only explanation was to invoke the fraud exception. Respondent did not contend that the notice of deficiency was sent within the general 3-year period. Thus, the only matter in dispute is the application of the fraud exception, a matter as to which the entire burden of proof is on respondent. Petitioner's failure to discuss the statute of limitations on brief is of no consequence. Respondent's failure to do so is excusable in the circumstances of this case. Compare Flint v. Commissioner, T.C. Memo. 1991-405. On the other hand, we note that the notice of deficiency was mailed less than 6 years after Apr. 15, 1983, the date that the 1982 tax return is deemed to have been filed. See sec. 6501(b)(1). Although respondent determined in the notice of deficiency that petitioner had omitted $ 126,807.72 from gross income for 1982, an amount far more than 25 percent of the amount of gross income stated in the tax return, respondent has not invoked the 6-year statute of limitations provided for in sec. 6501(e)(1). Under the circumstances, we will not consider this alternative to the fraud exception to the 3-year statute of limitations. See Estate of Fusz v. Commissioner, 46 T.C. 214, 215↩ n.2 (1966).
12. SEC. 7454. BURDEN OF PROOF IN FRAUD, FOUNDATION MANAGER, AND TRANSFEREE CASES. (a) Fraud. -- In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary.↩
1. Petitioner does not specifically state that he had no cash on hand on Dec. 31, 1982, but that seems to be the thrust of his contentions.↩
13. Petitioner's view of his cash management practices during the years in issue is illustrated by the following colloquy: THE COURT: If you opened up a drawer in your house and there was some currency in the drawer; how did you know whether it was the corporation's money or your money? THE WITNESS: Well, I kept it all separate all the time. THE COURT: All right. How did you go about keeping it separate? THE WITNESS: Well, most of the money I ever had I put back into the business, I didn't have a lot of money of my own at all. Any money that there was I kept aside, and sooner or later, up until very recently all the money I made went back into that business. THE COURT: Well, Mr. Corrigan, one of the problems that we're dealing with here is that there were two separate sets of tax disputes. One is the dispute as to your personal tax liabilities for 1981 and '82 and the other was a dispute, that has since been settled, as to your corporation's income tax liability for 1981 and 1982. And your corporation has a set of liabilities, you have a set of liabilities and we're trying to figure out at this point what are your liabilities as distinguished from your corporation's liabilities. The dispute as to the corporation's liabilities has been settled. But we're dealing with your liabilities. Now, you're telling me -- do I understand correctly that you're telling me that you had relatively little cash of your own as distinguished from the corporation's cash during these years? THE WITNESS: No, I had cash of my own. THE COURT: Well, I ask you again then, how did you go about knowing when you opened the drawer and found some cash whether it was the corporation's cash or your cash? THE WITNESS: Because I kept it separate. THE COURT: All right. Where did you keep the corporation's cash and where did you keep your cash? THE WITNESS: The corporation's cash was mostly kept, I believe, in the dresser. And my personal money was kept -- and the corporation was also kept in that box that we were talking about by the front desk in the vestibule and my money was kept in the closet. And sometimes the money for the -- some money was left -- put under the bed. THE COURT: Well, whose money was under the bed, if there was any money under the bed; the corporation's or yours? THE WITNESS: At this time I don't remember.↩
14. Many opinions, leading with Holland v. United States, 348 U.S. 121, 99 L. Ed. 150, 75 S. Ct. 127 (1954), have stressed the importance of establishing opening net worth with "reasonable certainty". In United States v. Giacalone, 574 F.2d 328 (6th Cir. 1978), the Court of Appeals dealt with a criminal fraud net worth case in which the Government's net worth computation showed "Cash on Hand" as an item, but had a dash next to that item at each of the critical dates. The "Total Assets" amount for each of the critical dates was consistent with Cash on Hand of zero. The Court of Appeals stated as follows, 574 F.2d at 331-332: The defendant argues that since the dashes added nothing to the totals they must be treated as zeroes. He points out that the government's evidence showed numerous cash purchases by the defendant and his wife, thus proving the existence of cash. Since no cash was shown on the statement, it cannot reflect accurately or with "reasonable certainty" the opening net worth figure for each year, he contends. This argument is fallacious. The entire thrust of the case was that the cash expenditures in each of the prosecution years were made from current taxable income received in that year, not from cash on hand at the beginning of the year. The government witness Campbell conceded that the defendant possessed some cash, but testified that the dashes represented an unknown, presumably constant amount and were similar to "X" in an algebraic equation. The defendant is a "professional gambler" (appellant's reply brief, pp. 4 & 42). Campbell testified that the net worth statement assumed the existence of a "bankroll" of cash which remained approximately the same throughout the period covered. However, he asserted that as a constant it did not affect the accuracy of the net worth statement. * * * Though we have found no case precisely on point we conclude that the use of dashes did not invalidate the net worth statement. * * *
See United States v. Scrima, 819 F.2d 996, 999↩ (11th Cir. 1987).
15. Respondent is not required to prove that the income omissions were substantial. However, when respondent succeeds in proving that the omissions were substantial in relation to the amounts that petitioner reported, then that increases the likelihood that the omissions were intentional, not merely inadvertent.↩
16. Sec. 6653 provides, in pertinent part, as follows: SEC. 6653. ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD. * * * (b) Fraud. -- (1) In General. -- If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. (2) Additional amount for portion attributable to fraud. -- There shall be added to the tax (in addition to the amount determined under paragraph (1)) an amount equal to 50 percent of the interest payable under section 6601 -- (A) with respect to the portion of the underpayment described in paragraph (1) which is attributable to fraud, and (B) for the period beginning on the last day prescribed by law for payment of such underpayment (determined without regard to any extension) and ending on the date of the assessment of the tax (or, if earlier, the date of the payment of the tax).
For 1981, the fraud addition to tax is sec. 6653(b), the first sentence of which is the same as the above-quoted sec. 6653(b)(1). Par. (2) was added by sec. 325(a) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 616, and was effective for taxes the payment of which (determined without regard to any extension) is after Sept. 3, 1982. In the instant case, par. (2) is applicable to the deficiency for 1982. The subsequent amendments of this provision by sec. 1503 of the Tax Reform Act of 1986 (Pub. L. 99-514, 100 Stat. 2085, 2742), by sec. 1015(b)(2)(A) of the Technical and Miscellaneous Revenue Act of 1988 (Pub. L. 100-647, 102 Stat. 3342, 3569), and by sec. 7721(a) of the Omnibus Budget Reconciliation Act of 1989 (Pub. L. 101-239, 103 Stat. 2106, 2395) do not affect the instant case. As a result of the 1989 Act, the revised fraud addition to tax now appears in secs. 6663 and 6651(f).↩
17. Sec. 1503(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2742, amended sec. 6653(b)(2) to provide as follows: SEC. 6653. ADDITIONS TO TAX FOR NEGLIGENCE AND FRAUD. * * * (b) Fraud. -- * * * (2) Determination of Portion Attributable to Fraud. -- If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes is not attributable to fraud.
This amendment placed the burden of proof on the taxpayer to establish that a portion of the deficiency was not↩ attributable to fraud. The amendment applies to returns the due date of which is after Dec. 31, 1986, and so does not apply to the instant case.
1. On brief, petitioner shows the aggregate of his concessions as $ 37,643.96. The addition on the brief errs by $ 999.90. This arithmetic error does not affect our analysis, because the parties have agreed to the amounts in dispute item by item.↩
18. The notice of deficiency credits petitioner with $ 26,431.66 as an inheritance, a nontaxable source of income for 1981. It also shows as one of petitioner's assets as of Dec. 31, 1981, a $ 5,657.97 balance in a bank account in Pawlak's name. Neither side has attempted to educate the Court as to whether either of these notice of deficiency items is related to Pawlak's asserted inheritance and repayment.↩
19. We have followed the parties' categorizations, which appear to be based on the notice of deficiency. In their categorization, the $ 500 check is under Other Family Consumption, and the $ 90 check is under Other Items.↩